# EXHIBIT 1

**CYNTHIA K. WONG**
**ATTORNEY AT LAW, LLLC**
CYNTHIA K. WONG    6053
cyn@legalmaui.net
2035 Main Street, Suite 2
Wailuku, HI 96793
Telephone: (808) 727-2921

**PANISH SHEA BOYLE RAVIPUDI LLP**
JESSE MAX CREED    11731
jcreed@psbr.law
11111 Santa Monica Boulevard, Suite 700
Los Angeles, CA. 90025
Telephone: (310) 477-1700

**LOWENTHAL & LOWENTHAL LLC**
JACOB LOWENTHAL    9945
jkl@lowenthal-hawaii.com
122 Maa Street, Suite B
Kahului, HI 96732
Telephone: (808) 242-5000

**APO, RECK & KUSACHI**
JAN K. APO    2960
jankapo@jankapo.com
24 North Church Street, Suite 302
Wailuku, HI 96793
Telephone: (808) 244-6073

Liaison for Individual Action Plaintiffs

Electronically Filed
SECOND CIRCUIT
2CSP-23-0000057
09-JAN-2024
03:15 PM
Dkt. 223 CMP

# IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

## STATE OF HAWAI'I

| | |
|---|---|
| ***In re Maui Fire Cases*** | S.P. NO. 2CSP-23-0000057 |
| | **Individual Plaintiffs' Master Complaint & Demand for Jury Trial** |
| | 1)  **Negligence – Utility Defendants** |
| | 2)  **Negligence – Telecom Defendants** |
| | 3)  **Negligence – Landowner Defendants** |
| | 4)  **Negligence – County of Maui** |
| | 5)  **Negligence – State of Hawai'i** |
| | 6)  **Abnormally Dangerous Activity – Landowner & Public Entity Defendants** |
| | 7)  **NIED** |
| | 8)  **Premises Liability** |
| | 9)  **Public Nuisance** |
| | 10) **Private Nuisance** |
| | 11) **Trespass** |
| | 12) **Inverse Condemnation – County of Maui** |
| | 13) **Inverse Condemnation – State of Hawai'i** |
| | 14) **Inverse Condemnation – Utility Defendants** |
| | 15) **Wrongful Death** |
| | 16) **Survival Action** |
| | Circuit Judge:  Hon. Peter T. Cahill |
| | Division:  2 |
| | Trial Date:  None set |

# TABLE OF CONTENTS

**PAGE NO.**

I.   Introduction......................................................................................................... 1

II.  Parties ................................................................................................................. 1

 A.  Individual Plaintiffs ........................................................................................ 1

 B.  Defendants ...................................................................................................... 2

   a.  Utility Defendants ..................................................................................... 2

   b.  Telecom Defendants .................................................................................. 3

   c.  Landowner Defendants .............................................................................. 3

   d.  Public Entity Defendants ........................................................................... 4

 C.  Doe Defendants ............................................................................................... 5

 D.  Agency, Joint Venture, and Concert of Action.................................................. 5

III. Jurisdiction .......................................................................................................... 5

IV.  General Factual Allegations .................................................................................. 6

 A.  For Years, Wildfire Risk Steadily Increased in Hawaiʻi and on Maui ................ 6

 B.  Defendants Received Warning of High Fire Risk Days Before the Maui Fires........... 9

 C.  The Maui Fires Caused Unprecedented Destruction .................................................. 11

   i.   The Upcountry Fires – the Olinda and Kula Fires........................................... 11

   ii.  The Lahaina Fire ............................................................................................ 13

   iii. Innocent Citizens Received no Warning of the Impending Disaster.............. 17

V.   Defendant-Specific Allegations.......................................................................... 22

 A.  The Utility Defendants Failed to Prevent the Ignition and Spread of the Maui Fires............... 22

   i.   The Utility Defendants Were Negligent by Not De-energizing their Facilities. ............ 24

   ii.  The Utility Defendants Negligently Designed, Constructed, Inspected, and Maintained their Electrical Facilities ..................................................... 26

 B.  The Telecom Defendants Failed to Prevent the Ignition and Spread of Wildfire ..................... 30

 C.  The Landowner Defendants Failed to Prevent the Ignition and Spread of Wildfire ................. 34

D.   The Public Entity Defendants Failed to Prevent the Ignition and Spread of the Maui Fires ..... 36

   i.   The Public Entity Defendants Negligently Maintained their Property............................ 36

   ii.   The County Violated its Statutory Duties to Identify Potential Fire Hazards ................. 37

E.   The Public Entity Defendants' Negligently Designed Exit-Route Roadways .......................... 39

F.   The Defendants' Individual and Collective Failures Cause Plaintiffs' Harms.......................... 40

VI.   Causes of Action .................................................................................................................... 41

   First Cause of Action – Negligence of Utility Defendants....................................................... 41

   Second Cause of Action – Negligence of the Telecom Defendants ....................................... 46

   Third Cause of Action – Negligence of the Landowner Defendants....................................... 52

   Fourth Cause of Action – Negligence of the County ............................................................. 54

   Fifth Cause of Action – Negligence of the State .................................................................... 56

   Sixth Cause of Action – Abnormally Dangerous Activity ...................................................... 57

   Seventh Cause of Action - Negligent Infliction of Emotional Distress................................... 58

   Eighth Cause of Action – Premises Liability ........................................................................ 59

   Ninth Cause of Action – Public Nuisance ............................................................................ 61

   Tenth Cause of Action – Private Nuisance............................................................................ 64

   Eleventh Cause of Action – Trespass .................................................................................... 65

   Twelfth Cause of Action – Inverse Condemnation – The County ......................................... 66

   Thirteenth Cause of Action – Inverse Condemnation – The State ......................................... 66

   Fourteenth Cause of Action – Inverse Condemnation – The Utility Defendants................... 67

   Fifteenth Cause of Action – Wrongful Death........................................................................ 68

   Sixteenth Cause of Action – Survival Action........................................................................ 68

VII.   Prayer for Relief .................................................................................................................. 69

DEMAND FOR JURY TRIAL ...................................................................................................... 72

## I.      Introduction

1.      This case concerns the deadliest American wildfires of the past century. On August 8, 2023, a series of wildfires ignited on the island of Maui in the State of Hawaiʻi. Those fires, including the Lahaina Fire, Olinda Fire, and Kula Fire (collectively the "Maui Fires") tore across the island. Based on current estimates, the fires burned over 3,000 acres, destroyed 2,000 homes and 800 businesses, and killed 99 people. The full extent of the disaster is still unknown.

2.      Individual Plaintiffs bring this action against various Defendants for their alleged contributions to the ignition, spread, and subsequent destruction of the Maui Fires.



*Figure 1: Lahaina, post-fire.* (August 11, 2023; Hawaiʻi Department of Land and Natural Resources.)

## II.     Parties

### A.      Individual Plaintiffs

3.      Individual Plaintiffs are the individuals and entities who are, and at all times relevant were, homeowners, renters, business owners, and other individuals and entities who suffered and continue to suffer personal injuries, property damage, business losses, and other damages as a result of the Maui Fires.

**B.**      **Defendants**

**a.**      **Utility Defendants**

4.      Defendant **Hawaiian Electric Industries, Inc.** ("**HEI**") is, and at all times relevant was, a Hawaiʻi corporation with its principal place of business in Honolulu, Hawaiʻi. **HEI** is a holding company and parent company of Defendant **Hawaiian Electric**. **HEI**'s subsidiaries provide electrical service to about 95% of the population of the State of Hawaiʻi. **HEI** was responsible for ensuring that its subsidiaries complied with all laws and regulations applicable to public utilities operating in the State of Hawaiʻi.

5.      Defendant **Hawaiian Electric Company** ("**HECO**") is, and at all times relevant was, a Hawaiʻi corporation with its principal place of business in Honolulu, Hawaiʻi. **HECO** is a direct subsidiary of **HEI** and the parent company of Defendants **Hawaii Electric Light** and **Maui Electric,** which have done business as **HECO** since 2019.

6.      Defendant **Hawaiʻi Electric Light Company** ("**HELCO**") is, and at all times relevant was, a Hawaiʻi corporation with its principal place of business in Honolulu, Hawaiʻi. Defendant Hawaiʻi Electric Light is an electrical utility and subsidiary of, and since 2019 has done business as, Defendant HECO.

7.      Defendant **Maui Electric Company Limited** ("**MECO**") is, and at all times relevant was, a Hawaiʻi corporation with its principal place of business in Kahului, Hawaiʻi. Defendant Maui Electric is an electrical utility and subsidiary of, and since 2019 has done business as, Defendant HECO.

8.      Defendants **HEI**, **HECO**, **HELCO**, and **MECO** (collectively, "**Utility Defendants**") are, and at all times relevant were, public utilities subject to regulation by the Hawaiʻi Public Utilities Commission and bound by all laws and regulations applicable to public utilities operating in the State of Hawaiʻi. Further, the Utility Defendants are, for all purposes, a singular operational entity whose funding, direction, control, shareholders, officers, and managers, are so intertwined such that each subsidiary and/or parent is the alter ego of all others.

2

**b.    Telecom Defendants**

9.      Defendant **Spectrum Oceanic, LLC** ("**Spectrum**") is, and at all times relevant was, a Delaware corporation with its principal place of business in St. Louis, Missouri. Spectrum is a telecommunications company and cable operator that serves retail customers in the State of Hawaiʻi. Spectrum is a subsidiary of Charter Communications, Inc. To conduct its business, Spectrum designs, constructs, maintains, and inspects telecom infrastructure, including hardware and equipment affixed to structures and fixtures, including those at or near the areas of origin of the Maui Fires

10.     Defendant **Cincinnati Bell, Inc.** ("**Cincinnati Bell**") is, and at all times relevant was, an Ohio corporation with its principal place of business in Cincinnati, Ohio. In 2018, the Hawaiian Public Utilities Commission approved Cincinnati Bell's purchase of **Hawaiian Telecom, Inc.**, the largest full-service provider of communication services in the Hawaiian Islands. Today, Cincinnati Bell conducts business in Hawaiʻi as **Hawaii Telecom, Inc**. To conduct its business **Cincinnati Bell**, designs, constructs, maintains, and inspects telecom infrastructure, including hardware and equipment affixed to structures and fixtures, including those at or near the areas of origin of the Maui Fires.

11.     Defendant **Hawaiian Telecom, Inc.** ("**Hawaiian Telecom**") is, and at all times relevant was, a brand and subsidiary of Cincinnati Bell with its principal place of business in Cincinnati, Ohio. To conduct its business **Hawaiian Telecom** designs, constructs, maintains, and inspects telecom infrastructure, including hardware and equipment affixed to structures and fixtures, including those at or near the areas of origin of the Maui Fires.

12.     Defendants **Spectrum**, **Cincinnati Bell**, and **Hawaiian Telecom** (collectively, "**Telecom Defendants**") are, and at all times relevant were, telecommunications companies subject to regulation by the Hawaiʻi Public Utilities Commission and bound by all laws and regulations applicable to public utilities operating in the State of Hawaiʻi and the County of Maui.

**c.    Landowner Defendants**

13.     Defendants Elliot Kawaiho'olana Mills, Crystal Kauilani Rose, Jennifer Noelani Goodyear-Ka'opua, Michelle Ka'uhane, and Robert K.W.H. Nobriga, are, and at all times relevant were, Trustees of **The Bishop Estate**, the largest private landowner in the State of Hawaiʻi. The Bishop Estate owns, controls, manages, and oversees the maintenance of property at or near the area of

origin and spread of the Lahaina Fire. **The Bishop Estate** holds interests in or title to, manages, controls, rents, or owns these properties as various entities, including **Bishop B P Tr Est** and **Kamehameha Schools**. For all purposes and at all times relevant, **The Bishop Estate Trustees**, including the Bishop Estate, all entities, subsidiaries, partnerships, or associations, whether formal or otherwise, operate as a single entity with the primary purpose of maintaining the assets of the Estate. Each act of each and every entity affiliated with or under the control or direction of the Estate is directly attributable to every other entity, rendering each entity the alter ego of every other entity.

14.      Defendant **Hawai'i Housing Finance and Development Corporation** ("**HFDC**") is, and at all times relevant was, a corporate landowner in the State of Hawai'i. **HFDC** owns, controls, manages, and oversees the maintenance of property at or near the area of origin and spread of the Lahaina Fire.

15.      These holders of interest in real property, and others unknown to Plaintiffs, (collectively, "**Landowner Defendants**") are, and at all times relevant were, subject to all laws and regulations applicable to persons owning, managing, and controlling property in the State of Hawai'i and the County of Maui.

### d.      Public Entity Defendants

16.      Defendant **County of Maui** (the "**County**") is, and at all times relevant was, a municipal corporation chartered under the laws of the State of Hawai'i. The County owns, controls, manages, and oversees the maintenance of property at or near the area of origin and spread of the Maui Fires and, like any other landowner, was responsible for ensuring that its property was managed in a way that did not create or facilitate the risk of a wildfire igniting or spreading. Further, at all times relevant the County was bound by all duties and responsibilities set forth in the Maui County Code, the laws of the State of Hawai'i, and all applicable regulations.

17.      Defendant **State of Hawai'i** (the "**State**") is, and at all times relevant was, a sovereign state of the United States of America. The **State** owns, controls, manages, and oversees the maintenance of property at or near the area of origin and spread of the Maui Fires and, like any other landowner, was responsible for ensuring that its property was managed in a way that did not create or facilitate the risk of a wildfire igniting or spreading. Further, at all times relevant the State was bound

by all duties and responsibilities set forth in the laws of the State of Hawaiʻi, and all applicable regulations.

### C.    Doe Defendants

18.    Except as described herein, and despite diligent investigation, Plaintiffs are ignorant of the true names and/or capacities of the Defendants sued as Does 1 through 200 ("**Does 1-200**"), inclusive. Therefore, Plaintiffs sue such Defendants by such fictitious names pursuant to Rule 17, subdivision (d) of the Hawaiʻi Rules of Civil Procedure. Following further investigation and discovery, and within a reasonable time after discovering the identity of any of Does 1-200, Plaintiffs will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named Doe Defendants are responsible in some manner for the acts, occurrences, and events alleged herein. These Doe Defendants aided, abetted, and/or conspired with Defendants in the wrongful acts and course of conduct, or otherwise negligently caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

### D.    Agency, Joint Venture, and Concert of Action

19.    At all times relevant, Defendants were the agents, servants, employees, partners, aiders and abettors, co-conspirators, and/or joint venturers of each of the other Defendants and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, enterprise, conspiracy, and/or joint venture, and each Defendant has ratified and approved the acts of each of the remaining Defendants. Each Defendant aided and abetted, encouraged, and rendered substantial assistance to the other Defendant in breaching their obligations to Plaintiffs. In taking action to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings alleged herein, each of the Defendants acted with an awareness of their primary wrongdoing and realized their conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## III.    Jurisdiction

20.    This Court has subject matter jurisdiction over all causes of action alleged herein pursuant to section 603-21.5, subdivision (a)(2) of the Hawaiʻi Revised Statutes.

21.     This Court has personal jurisdiction over all parties to this action because every party is either domiciled in or has sufficient minimum contacts with the State of Hawai'i which arise out of or relate to the causes of action alleged herein such that the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice.

22.     Venue is proper in this Circuit pursuant to section 603-36 of the Hawai'i Revised Statutes because the claims for relief arose in this Circuit.

## IV.     General Factual Allegations

### A.     For Years, Wildfire Risk Steadily Increased in Hawai'i and on Maui

23.     Each of the Defendants knew or should have known that wildfire risk was steadily increasing in the Hawaiian Islands and specifically on the island of Maui years before the Maui Fires.

24.     As certain agricultural practices have declined and drought conditions have become more severe, the total area of land burned in Hawai'i has steadily increased over the past century.[1] Indeed, over the past decade Hawai'i has seen an average of over 1,000 ignitions burning 20,000 acres per year.[2] Across Hawai'i, some substantial fires included: the Waikoloa Village Fire (2003); Kawaihae Road Fire (2004); Akone Pule Highway Fire (2005); Nanakuli Brush Fire (2005); Waikele Fire (2005); Olowalu Fire (2007); Waialua Fire (2007); Puako Fire (2007); Kaunakakai Fire (2009); and Mana Road Fire (2021).

25.     The island of Maui has not been spared from increasing wildfire risk. Between 1999 and 2019, there were 80 reported fires in the County of Maui. Twenty-eight of those fires were in West Maui, fourteen were in Kihei-Makena, and twelve were in Wailuku-Kahului.[3]

26.     Catastrophic wildfires are not a novel concept for Maui. Indeed, since 2006, the federal government declared disasters for four separate wildfires on the island of Maui: the Ma'alaea Fire (2006), Olowalu Fire (2007), Ma'alaea Fire (2010), and Kahana Ridge Fire (2019).

27.     In 2018, Hurricane Lane, a tropical cyclone that brought high winds to portions of the island of Maui, toppled power lines across western Maui and caused the rapid spread of fires that burned over 2,800 acres, destroyed 22 homes, and forced six-hundred people to flee for their lives.

---

[1] https://pacificfireexchange.org/region/hawaii/ (accessed August 22, 2023).
[2] *Id.*
[3] https://www.mauicounty.gov/DocumentCenter/View/125977/2020-Maui-County-Hazard-Mitigation-Plan-Final?bidId= (at p. 485).

28.     Hurricane Lane was a red flag to each and every Defendant concerning the wildfire risks posed by high winds and drought conditions, proper management of private and public property, and the hardening of equipment and systems used to provide electrical or telecommunications service. Further, the dangers presented by the catastrophic fires of 2018 should have spurred action among all Defendants to update or adapt their policies, practices, and procedure relating to wildfire risk, public safety, property management, and emergency management.

29.     In both 2018 and 2022, fields of dry grass near Lahaina ignited, causing substantial and widely known fires. Coupled with the regular high winds and dry conditions, these fires also served as prominent warning signs that should have been heeded.

30.     Plaintiffs are informed, and thereon allege, that each and every Defendant knew or should have known of these wildfire and wind-driven events as well as the increasing wildfire risk on the island of Maui. Accordingly, each and every Defendant should have taken all appropriate measures to prevent or mitigate the risks of fire ignition and spread associated with the changing conditions long before the ignition of the Maui Fires.

31.     The steadily increasing wildfire risks on Maui also coincided with increasingly severe and frequent fires in other parts of the world, including the western United States. As detailed herein, the Utility Defendants in particular were or should have been aware of catastrophic wildfires in other parts of the country, and particularly those caused or allegedly caused by the furnishing of electricity to retail customers.

32.     By 2020, wildfire risk on the island had reached an untenable level and, in response, the County filed suit against several fossil fuel producers in response to growing concerns over environmental impacts of climate change – including the increased risk of wildfire on the island.[4]

33.     In its Complaint, the County specifically alleged that "[w]ildfires are becoming more frequent, intense, and destructive" in the county and that changing weather patterns "provide prime conditions for fast-growing grasses and invasive species, followed by prolonged periods of drought and hotter averages, which desiccate vegetation thereby increasing the fuel available for fires."

---

[4] https://www.mauicounty.gov/DocumentCenter/View/124390/Maui-County-Climate-Change-Litigation-Complaint, at ¶¶ 173-174, 196.

34.     The County also alleged that its "fire 'season' now runs year-round, rather than only a few months of the year" and, in 2019, "called 'the year of fire' on Maui, 26,000 acres burned in the County—more than six times the total area burned in 2018"—with two fires in July 2019 that burned 9,200 acres and another in October 2019 that burned 4,100 acres.[5] Similarly, West Maui was categorized as having a "highly likely" probability—or more than a 90% chance—of wildfires each year on average.[6]

35.     The County continued to raise alarms over wildfire risk the following year. In July 2021, The County's Cost of Government Commission issued a report on "Wildfire Prevention and Cost Recovery on Maui" (the "County Report").

36.     The County Report makes explicit what each and every Defendant knew for years: "the number of incidents from a combination of wild/brush/forest fires appears to be increasing, and that this increase poses an increased threat to citizens, properties, and sacred sites." In addition, "[i]sland communities are particularly vulnerable because populations tend to be clustered and dependent on single highways, often located on the island's edge."[7]

37.     Meanwhile, the "the average area burned per year in Hawaiʻi has increased 300% over the past century," with ignitions accounting for 95% of wildfires. Critically, over one-third of Hawaiʻi's neighborhoods are in the "extreme fire hazard category."[8] Research also suggests that "Hawaiʻi lands burned by wildfires were increasing substantially over time, but at a higher rate than on the fire-prone U.S. Mainland."[9]

38.     One reason the fire risk continued to rise was because the County of Maui was in the midst of increasingly severe drought conditions. According to the U.S. Drought Monitor, approximately 40% of the County was classified as "abnormally dry," over 38% was classified as "moderate drought," and over 20% was classified as "severe drought" by August 2023.[10]

---

[5] https://www.mauicounty.gov/DocumentCenter/View/124390/Maui-County-Climate-Change-Litigation-Complaint, at ¶¶ 173-174, 196 (accessed August 17, 2023).
[6] *West Maui Had Been Warned It was at High Risk for Wildfires*, The New York Times, August 12, 2023, https://www.nytimes.com/2023/08/12/us/west-maui-wildfires-risk.html. (accessed August 17, 2023)
[7] *Report on Wildfire Prevention and Cost Recovery on Maui*, Cty. of Maui Cost of Gov. Comm'n. (2021), at 1-2. (accessed August 17, 2023)
[8] https://pacificfireexchange.org/resource/slide-presentation-overview-of-wildfire-in-hawaii/ (2023) (accessed August 16, 2023)
[9] *The Contemporary Scale and Context of Wildfire in Hawaiʻi*, Pacific Science, 69(4):427–444 (Oct. 2015), https://doi.org/10.2984/69.4.1. (accessed August 16, 2023)
[10] U.S. Drought Monitor, Maui County, HI, https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?fips_15009. (accessed August 16, 2023)

39.      But even if drought conditions improve, the risk of wildfire does not disappear. After wet winters, vegetation—particularly grasses —grow substantially. When the seasons change and those same grasses dry and become a bulk supply of readily ignitable fuel.[11]

40.      Accordingly, the proper management of vegetation near ignition sources, whether they could themselves be the cause of a sparking event or merely fuel, was paramount at all times. Dry invasive grasses, thickets, bushes, and brush – particularly those located in areas with high fire risk and where an ignition could be difficult to detect or extinguish – needed proper and proactive management. Indeed, the County Report urged responsible parties to "routinely inspect power transmission lines and rights of way" while tasking the County *and* the utilities with corrective action.[12]

41.      In light of these publicly acknowledged conditions and commonsense risks, each and every Defendant should have acted to prevent or mitigate the risk of wildfire ignition and spread. Instead, the Defendants individually and collectively failed to act in a reasonable manner and, as a result, caused or contributed to the ignition and spread of the Maui Fires.

**B.      Defendants Received Warning of High Fire Risk Days Before the Maui Fires**

42.      On August 4, 2023, the National Weather Service ("NWS") issued a public notice via social media that Hawai'i may experience impacts from the developing Hurricane Dora into the following week. Specifically, NWS cited the potential for strong and gusty trade winds, dry weather, and high fire danger.

43.      On August 6, 2023, NWS issued a second public notice via social media. This time, the notice cautioned that impending weather, coupled with dry conditions, posed a "serious fire" and "damaging wind threat" and warned the public to "stay alert." In addition, NWS issued a separate alert warning that although Hurricane Dora would not directly impact Hawai'i it created "a threat of damaging winds [and] fire weather" from Monday, August 7, 2023 through Wednesday, August 9, 2023.

44.      On August 7, 2023, NWS issued an updated warning. This time, the warning contained two critical components: a High Wind Watch and a Fire Warning for those portions of the state in the

---

[11] *Hawaii Is Losing As Much Of Its Land To Wildfires As Any Other State*, Nathan Eagle, August 26, 2019, https://www.civilbeat.org/2019/08/hawaii-is-losing-as-much-of-its-land-to-wildfires-as-any-other-state/. (accessed August 17, 2023)
[12] *See*, Note 7, *supra*, at 12.

9

path of the forecasted winds. Further, the warning noted that the winds could down electrical overhead facilities and facilitate the spread of a fire. The historic town of Lahaina, located on the western shore of the island of Maui, was subject to these warnings.

45.     On August 8, 2023, the NWS issued both a High Wind Warning and a Red Flag Warning for portions of the State of Hawai'i, including the island of Maui and, specifically, its western shore. According to NWS, a "Red Flag Warning" is reserved for circumstances in which "critical fire weather conditions [are] either occurring now or will occur shortly" and advises that "a combination of strong winds, low relative humidity, and warm temperatures can contribute to extreme fire behavior."

46.     In the August 8th notice, the NWS specifically warned that winds could reach between 30-45 miles per hour, with gusts up to 60 miles per hour. In addition, its Red Flag Warning forecast "[h]igh fire danger with rapid spread," advised against any outdoor burning, and urged the public to stay safe and cautious.

47.     Plaintiffs are informed, and thereon allege, that each and every Defendant knew or should have known of the impending weather conditions from August 4, 2023 onward and should have taken all appropriate measures to prevent against or mitigate the risks of fire ignition and spread associated with those warnings. Instead, and as alleged herein, Defendants individually and collectively failed to act properly in response to foreseeable risks and, as a result, caused or contributed to the ignition and spread of the Maui Fires.

48.     Each of the Defendants, as alleged herein and detailed below, knew that their conduct under such conditions had a relationship to wildfire risk and public safety.

49.     The Utility Defendants and the Telecom Defendants knew that their facilities had to be designed, constructed, inspected, and maintained in a way that did not increase the risk of wildfire ignition, particularly during drought conditions and when exposed to high winds.

50.     The Landowner Defendants, as well as the County and the State, knew that vegetation on their property could readily serve as a fuel source for the ignition and spread of wildfire. Accordingly, they each knew or should have known that developing and implementing operating policies, practices, and procedures for managing or removing vegetation, including grasses, trees,

10

ground cover, dry brush, and others, was necessary so that they did not contribute to the ignition or spread of a wildfire.

51.     Similarly, the County and the State knew that, in the event of a wildfire, citizens would rely on the County's operating procedures, including emergency warning systems, to avoid personal injury or death.

52.     All Defendants, regardless of their form or status, were required to comply with the laws and regulations of the State of Hawai'i, including the Hawai'i Revised Statutes and Hawai'i Administrative Rules, as well as the Maui County Code and State Fire Code.

53.     Yet, each and every Defendant, as alleged herein, fell short of their respective responsibilities. As a result of the Defendants' individual and collective failures, the Maui Fires ignited and spread and caused Individual Plaintiffs the damages alleged herein.

**C.     The Maui Fires Caused Unprecedented Destruction**

**i.     The Upcountry Fires – the Olinda and Kula Fires**

54.     Around 10:47 p.m. on August 7, 2023, as strong winds impacted the island of Maui, a security camera located at the Maui Bird Conservation Center in Upcountry Maui faced a nearby tree line. Suddenly, a flash of light shone behind the tree line. Sensors recording the activity in the Utility Defendants' grid at the same time reported a substantial fault.



*Figure 2: Flash coinciding with fault (left); and post-fault fire (right)* (August 11, 2023, San Diego Zoo Wildlife Alliance.)

55.     Shortly after the video footage captured the flash of light and the sensors identified the fault, residents reported a brush fire – later named the Olinda Fire. The Olinda Fire spread rapidly, burned over 1,000 acres of land, and destroyed multiple structures, including homes. In addition, the Olinda Fire caused various communities and Plaintiffs to flee for their lives.

56.     Plaintiffs are informed, and thereon allege, that the Utility Defendants' facilities, in isolation or in combination with the Telecom Defendants' facilities, contributed to the ignition and spread of the Olinda Fire. Plaintiffs are further informed, and thereon allege, that the property surrounding the point of the ignition and spread of the Olinda Fire was mismanaged as alleged herein.

57.     On August 8, 2023, a second fire – named the Kula Fire – ignited in Upcountry Maui near the Haleakala Highway. Several residents reported trees falling on downed power lines near the ignition point of the Kula Fire. Plaintiffs are informed, and thereon allege, that the Utility Defendants' facilities, in isolation or in combination with the Telecom Defendants' facilities, contributed to the ignition and spread of the Olinda Fire. To date, the Kula Fire has burned over 200 acres.



*Figure 3: Pole 28, the suspected ignition source of the Kula Fire.*

**ii.   The Lahaina Fire**

58.     In the early morning of August 8, 2023, sensors monitoring the Utility Defendants' electrical grid observed two significant faults in the town of Lahaina.[13] Overnight and into the early morning of the 8th, sensors recorded approximately 34 faults on the Utility Defendants' facilities in Lahaina. These faults coincided with consistent and strong wind conditions.

59.     Around 3:00 a.m., a citizen living near Lahainaluna Road observed a bright flash from the direction of the Utility Defendants' electrical facilities.

60.     Just after 5:00 a.m., the Utility Defendants' equipment reported an outage affecting approximately 1,000 customers. The Utility Defendants should have acted immediately – particularly in light of the Olinda Fire which ignited the previous evening and was still burning – to ensure that their electrical facilities had not caused an ignition.

61.     Around 6:30 a.m., a brush fire was reported near the Utility Defendants' electrical facilities near Lahainaluna Road. A nearby resident took to social media to live-stream what he was able to see from his home near Lahainaluna Road.



*Figure 4: Screenshots of witness video showing suspected ignition of the Lahaina Fire on August 8, 2023.*

---

[13] A "fault" is an abnormality in or disruption of the flow of electricity through an electrical circuit.

62.     The video, posted to social media and shared by various news outlets, shows the Utility Defendants' overhead distribution lines falling to the ground under strong winds and igniting brush along the roadway.[14]

63.     According to the eyewitness, the scene looked "like somebody lit a fuse from a firework . . . [the fire] just followed a straight line all the way up to the pole where the [line] was, and it landed in a bigger pile of dry grass, and that just ignited" and "in a matter of minutes, that whole place was just engulfed."

64.     As the eyewitness continues to record, he alerts a first responder that "the line is live on the ground[.]"



*Figure 5: Pole 25, the suspected ignition point of the Lahaina Fire.*

---

[14] Video and eyewitness interview available at:
https://www.usatoday.com/videos/news/nation/2023/08/16/videos-put-scrutiny-downed-power-lines-possible-cause-deadly-maui-wildfires/8355836001/ (accessed August 17, 2023)

65.     In the face of this video evidence, the Utility Defendants have since admitted that their electrical facilities caused the brush fire near Lahainaluna Road on the morning of August 8, 2023. Plaintiffs are informed, and thereon allege, that the Utility Defendants' facilities, in isolation or in combination with the Telecom Defendants' facilities, contributed to the ignition and spread of the Lahaina Fire.

66.     First responders initially reported that this blaze was completely contained.

67.     Around 3:30 p.m., the Lahaina Fire broke containment and spread rapidly toward the town of Lahaina. In response, the County closed the Lahaina Bypass. Yet, neither the County nor the State issued warnings that could be expected to reach citizens in danger.

68.     Public and private lands near the area of origin, which were not properly managed to prevent and/or mitigate the ignition or spread of wildfire, facilitated the rapid spread and devastating nature of the Lahaina Fire.

69.     By 3:50 p.m., the Lahaina Fire had crossed the bypass and residences in Lahaina were burning. The town was in chaos. With essentially no warning, thousands of innocent people surrounded by a firestorm attempted to flee for their lives. They grabbed what little they could and attempted to escape the impending disaster. The roads out of Lahaina, including historic Front Street, were essentially gridlocked.

70.     The fire raged for hours. It consumed hundreds of homes and businesses and, in the process, claimed dozens of lives. By the early evening of August 8, 2023, individuals desperate to escape the oncoming conflagration were jumping into the sea.

71.     The Lahaina Fire was devastating. Current estimates are that over 2,100 acres were burned, 2,200 structures – nearly 90% of which were homes – were destroyed, and at least 99 people were killed. The rescue and recovery efforts are ongoing, and the full scale of the disaster is still unknown.



*Figure 7: Lahaina, post-fire.* (August 11, 2023; Hawaiʻi Department of Land and Natural Resources.)



*Figure 6: Lahaina, post-fire.* (August 11, 2023; Hawaiʻi Department of Land and Natural Resources.)

**16**

### iii.     Innocent Citizens Received no Warning of the Impending Disaster

72.     With the Maui Fires bearing down on the island, every second mattered. But when it mattered most, the Public Entity Defendants failed to activate their own warning sirens.

73.     For years, the County operated part of a statewide "All-Hazard" outdoor warning system ("AHS"), which is the "the largest single integrated public safety outdoor siren warning system in the world."[15] AHS consists of a series of sirens and equipment located throughout the County of Maui. There are 80 total sirens in the County, and approximately 14 sirens run along the coast of West Maui. The sirens are battery powered and charge using solar panels. Further, AHS is "just one part" of the larger Hawaiʻi Statewide Alert and Warning System" ("SAWS").[16]



74.     The State constructed and maintained AHS and shared operational and testing responsibility for AHS with the County. Thus, both Public Entity Defendants are responsible for ensuring the system functions as intended and are activated to the extent required by policies and procedures in place. According to the County, AHS "can be used for a variety of both natural and human-caused events; including tsunamis . . . wildfires . . . and more."

75.     When deployed in response to a natural hazard, a steady three-minute siren sounds at 121 decibels. These sirens instruct members of the public to "evacuate low-lying areas near the coastline, tune [a] radio or television to any local station, and listen for emergency information and instructions."

---

[15] https://www.mauisirens.com/ (accessed August 17, 2023)
[16] *Id.*

76.     Clearly, AHS is not simply to instruct members of the public to move from one place to another, but also to seek information through specific channels such as radio and television. Yet, in 2019, 2020, and 2021, Defendant Herman Andaya, the former administrator of the County's Emergency Management Agency, "repeatedly called sounding … the sirens 'a last resort'." For example, in a 2019 meeting of the County's public safety commission, Andaya claimed that "for the most part, people don't get their information from sirens."[17] And in 2021, Andaya claimed that the sirens were "for people who are outside, outdoors, or don't have their phones on them, who are not close to a TV or radio or, you know, things like that. So those – that's what the siren is really meant for."

77.     AHS is a different method of communicating an emergency to the public than a radio, television, phone, or the internet. One of the primary differences is that it does not rely on the electrical grid or cell towers to operate. Instead, it uses solar-powered batteries. Therefore, AHS has a distinct advantage over the alternative means of communicating because it can function even if the electrical grid or cellular towers are damaged by a wildfire.

78.     Similarly, reports indicate that the State also failed to activate sirens which could have been used to alert unsuspecting citizens of the Maui Fires. Indeed, according to the Hawai'i Emergency Management Agency: "Nobody at the state and nobody at the county attempted to activate those sirens based on our records[.]"[18]

79.     Instead of utilizing AHS, the Public Entity Defendants relied on notifications broadcast on televisions, radio stations, and to mobile phones. But all of these notification methods relied on external service to relay and receive a message. Televisions rely on cable or internet service. Cell phones rely on internet or cellular service. These external services depend on external hardware, often located outdoors, that is easily susceptible to destruction and/or damage from wildfires.[19]

---

[17] https://www.nbcnews.com/news/us-news/maui-emergency-management-director-sirens-Lāhainā-fire-rcna100464 (accessed August 17, 2023)

[18] https://www.cnn.com/2023/08/12/us/hawaii-emergency-warning-system-maui-wildfires/index.html (accessed August 17, 2023)

[19] https://www.cnn.com/2023/08/09/tech/cell-service-outages-maui-fires/index.html (accessed August 17, 2023)

### iv.    The Maui Fires Generated and Dispersed Substantial Environmental Pollution

80.     The Lahaina Fire, Olinda Fire, and Kula Fire – all of which are the direct and proximate result of the Defendants' conduct alleged herein – resulted in substantial environmental pollution across the State of Hawai'i, including in areas near the ignition and spread of the fires and the locations at or near Plaintiffs' properties.

81.     The environmental pollution created by the Maui Fires lead to the contamination of air, water, and soils on properties in which Plaintiffs held an interest as well as the contamination of public areas such that it constitutes a nuisance.[20]

82.     The destruction of buildings, vehicles, boats, and other infrastructure materials caused the release of toxic chemicals into the air and soil on Maui. According to Dr. Andrew Whelton, a civil engineer assisting with the cleanup, "[w]e know beyond a reasonable doubt that the soil is now contaminated. The water is contaminated where the harbor is, [and] the air is contaminated" based both upon experience with prior fires and the scope of the destruction.[21]

83.     The Maui Fires caused air pollution, including the release of ash, smoke, chemicals, metals, toxins, and other hazardous material in quantities and for durations which may endanger human health or welfare, plant or animal life, or property, or which may unreasonably interfere with the comfortable enjoyment of life and property throughout the State, including on Plaintiffs' properties.

84.     As recognized by the U.S. Environmental Protection Agency, wildfire smoke itself is a toxic substance and air pollutant that can cause serious health impacts.[22] Similarly, the destruction caused by the Maui Fires lead to the production of particulate pollution – including acids, organic chemicals, metals, soil, and dust particles.[23]

85.     The U.S. Environmental Protection Agency ("EPA") estimates that there are over 700,000 tons of ash, concrete slabs, and metal to be removed from Maui – about half the amount of debris removed from the World Trade Center site after 9/11.[24]

---

[20] https://www.reuters.com/graphics/HAWAII-WILDFIRE/CLEANUP/egpbmemanvq/
[21] https://www.insideindianabusiness.com/articles/purdue-prof-debris-removal-from-maui-wildfire-will-take-months
[22] https://www.epa.gov/sciencematters/science-behind-wildfire-smokes-toxicity
[23] https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1001EX6.txt
[24] https://www.washingtonpost.com/nation/2023/09/25/maui-recovery-debris-removal-rebuilding/

86.     In addition, preliminary ash samples taken from structures destroyed by the Kula Fire collected by the Hawaii Department of Public Health ("DOH") show elevated levels of lead and cobalt and very high levels of arsenic.[25]

87.     According to DOH, "the wildfire ash and dust are toxic and should be avoided. Based on the new preliminary data, the primary contaminant of concern is arsenic, a heavy metal that adheres to wildfire dust and ash."[26] Further, DOH expects that the ash in Lahaina will be similar to the ash

| Parameter | Unit | Lab Report #1 | Lab Report #2 | Lab Report #3 | Mean Lab Reports | Soil Environmental Action Level |
|-----------|------|---------------|---------------|---------------|------------------|--------------------------------|
| Arsenic | mg/kg | 3,240 | 3,260 | 3,080 | 3,193 | 23 |
| Cobalt | mg/kg | 86 | 81 | 89 | 85 | 4.7 |
| Lead | mg/kg | 640 | 769 | 655 | 688 | 200 |

collected from Kula because the sampled homes were constructed during the same time period.[27]

88.     The Maui Fires created environmental pollution that impacts water resources. Following the fires, researchers at the University of Hawai'i at Mānoa Water Resources Research Center emphasized that "[w]ildfires can damage buried drinking water systems, building plumbing, catchment systems, and private drinking water wells making them unsafe to use. This knowledge, which comes from research carried out on similar major urban-wildfire incidents, is the reason why the Lāhainā and Kula water systems were put under a Do-Not-Use Advisory by Maui DWS."[28]

89.     It is well known that wildfires can contaminate natural waters, including drinking water sources, with ash pollution and sediment.[29] Further, research following the Tubbs Fire (2017) and Camp Fire (2018) in California confirmed "widespread drinking water chemical contamination" in water distribution networks and not solely source waters following wildfires.[30] Other research

---

[25] https://health.hawaii.gov/news/newsroom/preliminary-kula-ash-samples-show-elevated-levels-of-toxic-substances/
[26] *Id.*
[27] *Id.*
[28] https://www.wrrc.hawaii.edu/maui-post-fire-community-water-info-hub/
[29] Proctor, CR, Lee, J, Yu, D, Shah, AD, Whelton, AJ. Wildfire caused widespread drinking water distribution network contamination. *AWWA Wat Sci.* 2020;e1183 at 2. https://doi.org/10.1002/aws2.1183
[30] *Id.* at 1.

determined that water distribution systems could become contaminated with volatile organic compounds and semi-volatile organic compounds.[31]

90.    After the Maui Fires became contained, state and federal authorities began actively addressing environmental pollution. These efforts included the "assessment, removal, and disposal of incident-generated hazardous materials, response to actual and potential oil discharges, and clearance of marine debris and sunken or displaced vessels from designated waterways, including Lāhainā Harbor, in the aftermath of the Western Maui Wildfire."[32] Similarly, the ashes from the fires of Lahaina undoubtedly contain heavy metals, residues, polychlorinated biphenyls ("PCB"), and more from burning plastics, asbestos, and other materials that could pollute the oceans near Lahaina as well as reefs and other marine life.[33]

91.    The water pollution created by the Maui Fires includes the release and dispersion of solid refuse, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical waste, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, soil, sediment, cellar dirt, and industrial, municipal, and agricultural waste into water throughout the State, including ground and surface water on Plaintiffs' properties, which did or are likely to create a nuisance or render such waters unreasonably harmful, detrimental, or injurious to public health, safety, or welfare, including harm, detriment, or injury to public water supplies, fish and aquatic life and wildlife, recreational purposes, and agricultural and industrial research and scientific uses of such waters, or cause such waters to violate applicable water quality standards.

92.    Current estimates are that the cleanup effort will cost hundreds of millions of dollars and over a year to complete.[34]

93.    Accordingly, Plaintiffs seek an order from this Court compelling Defendants, and each of them, to remediate the environmental pollution created by their conduct.

---

[31] Whelton, A. J., Seidel, C., Wham, B. P., Fischer, E. C., Isaacson, K., Jankowski, C., MacArthur, N., McKenna, E., & Ley, C. (2023). The Marshall Fire: Scientific and policy needs for water system disaster response. *AWWA Water Science*, e1318 at 1, 3, 9; https://doi.org/10.1002/aws2.1318.
[32] https://www.news.uscg.mil/Press-Releases/Article/3514484/unified-command-expanded-to-address-maritime-hazards-and-pollution-threats-foll/
[33] https://www.civilbeat.org/2023/08/race-underway-to-glue-down-the-lahaina-fires-toxic-ash-before-rains-wash-it-into-the-ocean/
[34] https://www.washingtonpost.com/nation/2023/09/25/maui-recovery-debris-removal-rebuilding/

## V.    Defendant-Specific Allegations

### A.    The Utility Defendants Failed to Prevent the Ignition and Spread of the Maui Fires

94.    In addition to the general allegations set forth above, Plaintiffs make the following allegations specifically against the Utility Defendants and in support of the Causes of Action brought against the Utility Defendants and the damages set forth in the Prayer for Relief contained herein.

95.    The Utility Defendants – HEI, HECO, HELCO, and MECO – designed, built, operate, and maintain the electrical facilities that ignited the Maui Fires in August 2023. These fires were not isolated incidents. Instead, they are the result of the deficient patterns and practices of a corporate monopoly more intent on making a profit than protecting the citizens it serves.

96.    Over the past century, the Utility Defendants have formed a state-sanctioned monopoly that provides electrical service to 95% of the State of Hawaiʻi. After first incorporating in 1891, Hawaiian Electric grew substantially. Eventually, the company set its sights on other utilities.

97.    In the fall of 1968, HECO acquired Maui Electric Company, certain of its property interests, and its electrical facilities. Less than two years later, in the spring of 1970, HECO acquired Hawaiʻi Electric Light, certain of its property interests, and its electrical facilities. With these purchases, Hawaiian Electric became the single largest provider of electrical service in the State of Hawaiʻi. Today, all three utilities do business as HECO.

98.    HEI was formed in 1983 and, today, is a publicly traded holding company. HEI and its board oversee its own business and the businesses of its subsidiaries, including HECO. Although HEI and HECO have separate boards of directors they are, for all purposes, one corporate entity. The Utility Defendants are, and at all times relevant were, regulated by the Hawaiʻi Public Utilities Commission (HPUC) and subject to the regulations, orders, and general rules of the Commission, including HPUC General Orders Nos. 6 and 7, and the Hawaiʻi Administrative Rules, as well as all laws of the State of Hawaiʻi, including section 10.10.3.1 of the Hawaiʻi State Fire Code.

99.    The Utility Defendants furnish electricity to the public through electrical grids, including on the island of Maui. The Utility Defendants' grid is made up of various electrical facilities both designed, constructed, inspected, maintained, operated, and managed by the Utility Defendants and by their predecessor entities. Some of these electrical facilities run underground, out of reach of

most weather and environment. Other parts of the grid are above ground. The familiar and ubiquitous above ground electrical facilities include the wooden poles and overhead lines that stretch above roads and power homes all across the State of Hawaiʻi.

100.   Even though they act as one entity, the Utility Defendants' grid is a patchwork of equipment designed and built by different subsidiaries at different times, including legacy facilities brought under HECO's control by its various acquisitions of other utilities. Accordingly, different components of the electrical grid – which are subjected to harsh island elements – degrade at different rates and under different conditions. Knowing this, the Utility Defendants should have developed a robust and proactive asset strategy program for designing, constructing, inspecting, and maintaining equipment at risk of sparking a fire.

101.   Similarly, the Utility Defendants knew that vegetation at or near its facilities posed a risk of wildfire ignition. Grasses at or near the rights of way used by the Utility Defendants and trees and other vegetation near the Utility Defendants' electrical facilities were, and have been, readily ignitable fuel for sparks or contributing factors to sparking. In turn, the Utility Defendants should have developed and implemented an effective practice for identifying and mitigating vegetation-related wildfire risks, including vegetation which could cause or serve as fuel for a wildfire ignition.

102.   As the Utility Defendants acknowledge, "[o]verhead lines are more vulnerable to adverse weather conditions and objects contacting lines[.]"[35] Indeed, one of the County Report's recommendations emphasizes that most wildfires are "caused by human action and should be preventable," and that "[a]boveground power lines that fail, short, or are low hanging can cause fire ignition (sparks) that could start a wildfire, particularly in windy or stormy conditions."[36]

103.   Further, as recently as 2022, the Utility Defendants admitted in a filing with the HPUC that "[t]he risk of a utility system causing a wildfire ignition is significant" and that they needed to "[m]itigate the probability of [their] facilities becoming the origin or contributing source of ignition for a wildfire," "[p]revent [their] facilities from contributing to the severity or breadth of wildfires," and

---

[35] https://www.hawaiianelectric.com/about-us/power-facts/undergrounding-utility-lines (accessed August 16, 2023)
[36] *See* Note 7, *supra*, at 12.

"[i]dentify and implement operational procedures to ensure the Companies can respond effectively to a wildfire."[37]

104.    The Utility Defendants also recognized that weather, including high winds, plays a role in fire ignition. For example, the Utility Defendants stated that "[d]etection of high-risk conditions" such as wind speed and relative humidity "will be used to trigger alternative operational procedures to minimize the risk of wildfires and enable experience response."[38]

105.    Similarly, the Utility Defendants knew that tropical storms and hurricanes posed foreseeable risks to their facilities. For example, their proposals for grid resilience enhancements to the HPUC stated that "the driver for these resilience enhancements is to prevent the failure of critical assets in severe event scenarios, such as a major storm or hurricane"[39] and that "Hurricane Lane in Hawaiʻi provides an example of an all too real and recent 'close-call' that demonstrates the threats are not a distant future issue and why critical resilience investments should not be delayed."[40]

106.    Yet, despite their extensive knowledge of risks associated with their system, the Utility Defendants failed to take reasonable steps to mitigate against or prevent the risks of wildfire ignition, including the risks present during high winds and drought conditions.

### i.    The Utility Defendants Were Negligent by Not De-energizing their Facilities.

107.    Although wildfire risks facing Maui were increasing, they were not unique. Wildfire is, and has been, a major concern of the utility industry for decades. In response to well-known concerns over utility-caused ignitions, several major electric utilities have developed a simple solution: shutting off the power through proactive de-energization.

108.    Proactive de-energization is the process by which a utility alters or eliminates the flow of energy to certain circuits in response to a risk of ignition. Some factors considered when deciding to

---

[37] 2022 EPRM, Hawaiian Electric at 26;
https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20220630_resilience_EPRM_application.pdf (accessed August 15, 2023)
[38] *Id.* at 50.
[39] *Application of Hawaiian Electric Company, Inc., Hawaiʻi Electric Light Company, Inc., Maui Electric Company, Limited; Exhibits A through L; Verification; Docket No. 2022-0135*, Exhibit F, p. 3, HAWAIʻI PUB. UTIL. COMM'N (June 30 2022),
https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20220630_resilience_EPRM_application.pdf.
[40] *Id.*

proactively de-energize a circuit including high winds, low humidity, "red flag" warnings, drought conditions, the presence of dry vegetative fuel, and fire threats to electrical infrastructure.[41]

109.    All of these factors were present when the Maui Fires began. Accordingly, the Utility Defendants had actual knowledge or reason to know that their facilities did or could foreseeably create a risk of harm to the public.

110.    Indeed, major electrical utilities in fire-prone areas began using proactive de-energization to reduce the risk of utility-caused wildfire over a decade ago. One prominent example of proactive de-energization is San Diego Gas & Electric Company ("SDG&E"). SDG&E serves 1.4 million retail electric customers in a 4,100 square mile service area, which spans two counties in Southern California. After its electrical facilities ignited catastrophic wildfires during high winds and under drought conditions, SDG&E applied for and, in 2012 received, authority to implement a proactive de-energization program for its electrical facilities in certain circumstances.

111.    Using its proactive de-energization program, SDG&E can identify equipment at risk of causing an ignition due to weather, alter the flow of electricity in its grid, and notify customers days in advance of that alteration. Since implementing its proactive de-energization program over a decade ago, SDG&E's electrical facilities have not sparked a single catastrophic wildfire.

112.    Since 2012, other major utilities have implemented similar programs in wildfire-prone California, including Southern California Edison, PacifiCorp, Bear Valley Electric Service, and Liberty Utilities. Even Pacific Gas & Electric Company ("PG&E"), whose overhead electrical facilities ignited the North Bay Fires in 2017 and caused the deaths of 44 people, began to implement a proactive de-energization program in the fall of 2018.

113.    By the Utility Defendants' own admission, they reviewed the wildfire mitigation plans of SDG&E and PG&E—both of which implemented proactive de-energization programs—"to identify best practices that would be appropriate for Hawai'i's environment and weather conditions."[42]

---

[41] https://prepareforpowerdown.com/ (accessed August 16, 2023)

[42] *Application of Hawaiian Electric Company, Inc., Hawai'i Electric Light Company, Inc., Maui Electric Company, Limited; Exhibits A through L; Verification; Docket No. 2022-0135*, Exhibit C, p. 18, HAWAI'I PUB. UTIL. COMM'N (June 30 2022), https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20220630_resilience_EPRM_application.pdf.

25

114.    In fact, in their June 2022 Climate Adaptation Transmission and Distribution Resilience Program proposal to the HPUC, the Utility Defendants recognized that proactive de-energization programs were aimed at mitigating the risk of wildfires in the event of damage and failures on their facilities.[43]

115.    But instead of learning from other fatal tragedies, the Utility Defendants remained defiant and refused to implement a proactive de-energization program to combat wildfire risk.

116.    Accordingly, when high winds arrived on the island of Maui in August 2023, the Utility Defendants' electrical facilities were not prepared. The power continued to flow through those facilities, and they caused or contributed to the ignitions of a series of major wildfires across Maui.

117.    Despite knowing the risks associated with operating electrical facilities during high winds and drought conditions, the Utility Defendants chose not to implement a proactive de-energization plan nor otherwise alter or restrict the flow of electricity to or through their facilities when faced with an increased risk of wildfire ignition.

118.    Plaintiffs are informed, and thereon allege, that the Utility Defendants' failure to implement such a proactive de-energization program constitutes a conscious disregard for a known safety risk and was made or ratified by the officers, directors, or managing agents of the Utility Defendants. Accordingly, the conduct was malicious and entitles Individual Plaintiffs to an award of punitive damages.

### ii.    The Utility Defendants Negligently Designed, Constructed, Inspected, and Maintained their Electrical Facilities

119.    The Utility Defendants had the means, knowledge, and ability to design, construct, inspect and maintain their electrical facilities in a way that would harden or prepare those facilities for the risks of ignition presented by high winds and drought conditions.

120.    Indeed, the Utility Defendants knew that their electrical facilities were not up to date or reasonably maintained to prevent an ignition. Plaintiffs are informed, and thereon allege, that deficiencies in the Utility Defendants' facilities are the result of the Utility Defendants' failures to properly budget for, plan for, and prioritize upgrades.

---

[43] *Id.* at Exhibit F, p. 3–4.

121.    Plaintiffs are further informed, and thereon allege, that the Utility Defendants' long term and short-term incentive-based compensation programs for employees and executives did not take public safety, including safety related to electrical operations, fire ignitions, wildfire risk, and other critical safety metrics, into account. These deficiencies included, among others: not correlating executive compensation to public safety metrics; not developing or recording metrics for incentive-based compensation that drew the attention of employees, management, and executives to public safety risks; misaligning incentive-based compensation metrics with the ongoing design, construction, and maintenance of electrical facilities; and inadequate reporting of risks arising from electrical operations to management and executives.

122.    In 2019, the Utility Defendants admitted to the HPUC that they had a substantial need to replace wooden poles in their grid and warned of a "serious public hazard" if those poles failed.[44]

123.    In 2020, in response to a request from the HPUC, the Utility Defendants began to publicly acknowledge that the wooden poles throughout their system, a critical component of their electrical facilities and grid, were at risk of failure. For example, over 39% of the wooden poles within the Utility Defendants' system were over 51 years old. These aging poles were also rated for their ability to withstand strong winds. These aging poles, which made up over a third of the Utility Defendants' system, were rated for 56 miles per hour. As noted, the NWS' August 8th notice specifically warned of gusts up to 60 miles per hour.

124.    The issues facing the Utility Defendants' aging and fragile infrastructure should have been enough to spur system hardening. The fires resulting from Hurricane Lane in 2018, caused by high winds in West Maui, were undoubtedly a red flag. Yet, the Utility Defendants continued to delay for one reason: money.

125.    Between 2019 and 2020, the Utility Defendants apparently invested less than $245,000 on wildfire-specific projects.[45]

126.    In their 2022 Exceptional Project Recovery Mechanism ("EPRM"), the Utility Defendants sought a rate increase from the HPUC. Part of the Utility Defendants' explanation for their

---

[44] https://abcnews.go.com/Business/wireStory/bare-electrical-wire-poles-replacement-maui-match-strong-102584387
[45] https://www.wsj.com/us-news/wildfire-risk-maui-hawaiian-electric-7beed21e

request was to obtain additional funding for system hardening.[46] Within that request, the Utility Defendants sought $7,708,000.00 to strengthen approximately 80 poles in Maui County. And, according to the Utility Defendants, these poles were in a "severe wood decay zone" which created the potential not just that poles may be vulnerable but may fail under certain conditions.

127. Meanwhile, the Utility Defendants continued to reap financial rewards from ratepayers. In fact, the Utility Defendants were financially secure and successful enough in August 2023 to declare a dividend of $40 million to shareholders – four days before the ignition of the Maui Fires.

128. Despite needing to allocate funds for critical safety measures such as system hardening, the Utility Defendants provided officers with lavish compensation. According to a 2023 proxy statement submitted by HEI, and illustrated in the table below, the officers of Hawaiian Electric, including one former executive, collectively received over $13,000,000.00 in total compensation between 2021 and 2022.[47]

**2022 SUMMARY COMPENSATION TABLE**

| NAME AND 2022 PRINCIPAL POSITIONS | YEAR | SALARY ($)[1] | BONUS ($)[2] | STOCK AWARDS ($)[3] | NONEQUITY INCENTIVE PLAN COMPENSATION ($)[4] | CHANGE IN PENSION VALUE AND NONQUALIFIED DEFERRED COMPENSATION EARNINGS ($)[5] | ALL OTHER COMPENSATION ($)[6] | TOTAL WITHOUT CHANGE IN PENSION VALUE ($)[7] | TOTAL ($) |
|---|---|---|---|---|---|---|---|---|---|
| Scott W. H. Seu HEI President & CEO ASB Chair | 2022 | 875,000 | — | 1,830,874 | 869,129 | 236,512 | — | 3,575,003 | 3,811,515 |
| | 2021 | 506,667 | — | 821,405 | 599,588 | 1,002,005 | — | 1,927,660 | 2,929,665 |
| | 2020 | 419,750 | — | 651,282 | 394,587 | 999,547 | — | 1,465,619 | 2,465,166 |
| Paul K. Ito HEI Executive Vice President, CFO & Treasurer* | 2022 | 313,425 | 108,750 | 244,373 | 140,054 | — | 9,150 | 815,752 | 815,752 |
| Kurt K. Murao HEI Executive Vice President, General Counsel, Chief Administrative Officer and Corporate Secretary | 2022 | 428,667 | — | 467,085 | 255,475 | — | 15,281 | 1,166,508 | 1,166,508 |
| | 2021 | 402,000 | — | 499,262 | 443,638 | 252,374 | 14,873 | 1,359,773 | 1,612,147 |
| | 2020 | 352,000 | — | 369,992 | 244,954 | 315,725 | — | 966,946 | 1,282,671 |
| Shelee M. T. Kimura Hawaiian Electric President & CEO | 2022 | 450,000 | — | 814,267 | 249,909 | — | — | 1,514,176 | 1,514,176 |
| Ann C. Teranishi ASB President & CEO | 2022 | 605,000 | — | 600,723 | 764,357 | — | 56,774 | 2,026,854 | 2,026,854 |
| | 2021 | 473,707 | — | 626,520 | 600,098 | — | 23,996 | 1,724,321 | 1,724,321 |
| Gregory C. Hazelton Former HEI Executive Vice President and CFO | 2022 | 278,733 | — | 757,904 | 193,721 | — | 15,126 | 1,245,484 | 1,245,484 |
| | 2021 | 546,400 | — | 1,100,746 | 653,243 | 116,175 | 26,054 | 2,326,443 | 2,442,618 |
| | 2020 | 543,750 | — | 707,755 | 412,830 | 186,825 | 26,328 | 1,690,663 | 1,877,488 |

---

[46]https://www.hawaiianelectric.com/documents/about_us/our_vision_and_commitment/resilience/20220630_resilience_EPRM_application.pdf at 1-2, 43.
[47] HEI March 23, 2023 Proxy Statement, https://s2.q4cdn.com/268623243/files/doc_financials/2022/ar/HEI-2023-Notice-of-Annual-Meeting-Proxy-Statement.pdf at 51.

129.    Clearly, the Utility Defendants had sufficient resources to contribute to critical safety upgrades before the Maui Fires. Indeed, it appears that the Utility Defendants' compensation structure, which they describe as a "pay for performance design" emphasizes financial results over the safety and risk exposure to the Utility Defendants' customers and the public.[48]

130.    Further, in their September 19, 2023, letter to the House of Representatives' Committee on Energy and Commerce, the Utility Defendants lauded the benefits of covered conductors. Specifically, they noted that covered conductors "improve reliability and mitigate fire risk by reducing the likelihood of faults caused by conductors making contact with objects, and contact between phases, or swing shorts."[49] Yet, since 2019 the Utility Defendants only installed a total of 90,000 feet—or 17 miles—of covered conductor on the islands of Maui and Moloka'i combined.[50]

131.    Plaintiffs are informed, and thereon allege, that despite paying millions of dollars to executives and millions more in dividends, the Utility Defendants took actions that did not adequately or appropriate allocate resources to the design, construction, inspection, and maintenance of electrical facilities, including those facilities at or near the areas of origin of the Maui Fires.

132.    In doing so, the Utility Defendants failed to operate a culture of corporate safety which, in turn, caused or contributed to the inadequate implementation of construction and design programs, inspections and maintenance, the hiring, training, retention, and oversight of qualified employees, agents, and contractors responsible for the design, construction, inspection, and maintenance of those facilities, including the placement of equipment and management of vegetation at or near that equipment.

133.    The Utility Defendants were responsible for developing policies, practices, and procedures for ensuring that any employee, agent, or contractor performing activities which impacted their facilities was properly trained, prepared, and overseen to ensure that their conduct did not create a risk of harm to third parties.

---

[48] *Id.* at 5.
[49] Letter to from Shelee Kimura, President and Chief Executive Officer, Hawaiian Electric, et al., to the Committee on Energy and Commerce of the United States House of Representatives, et al., (Sept. 19, 2023), *available at* https://www.hawaiianelectric.com/documents/about_us/news/2023/20230919_house_cec_response.pdf.
[50] *Id.*

134.    Yet, by misaligning financial incentives for executives, employees, agents, and contractors, the Utility Defendants failed to exercise reasonable care in the oversight of those involved in its enterprise. In doing so, the Utility Defendants chose to place profits over safety.

135.    In addition, the Utility Defendants failed to exercise reasonable care in the design, construction, inspection, and maintenance of their electrical facilities in a manner that ensured the safe delivery of electricity to members of the public.

136.    HPUC General Order No. 6 sets forth the standards for the design and construction of overhead lines. HPUC General Order No. 7 sets forth the standards for electric utility service in the state of Hawai'i. Other applicable rules and regulations, including H.A.R. § 6-73-13, sets forth standards for the installation, operation, and maintenance of overhead electrical supply and communication lines according to the National Electric Safety Code.

137.    Plaintiffs are informed, and thereon alleged, that the Utility Defendants' electrical facilities at or near the areas of the ignition and spread of the Maui Fires were not compliant with HPUC General Orders Nos. 6 or 7 or the standards established by H.A.R. § 6-73-13, among other laws and regulations.

138.    Plaintiffs also are informed, and thereon allege, that the Utility Defendants' failure to appropriately design, construct, inspect, and maintain their electrical facilities, including the proper management of vegetation near those facilities, despite having actual knowledge of the potential risks, constitutes a conscious disregard for a known safety risk and was made or ratified by the officers, directors, or managing agents of the Utility Defendants. Accordingly, the conduct was malicious and entitles Individual Plaintiffs to an award of punitive damages.

139.    As a result of the Utility Defendants' failures, Plaintiffs suffered substantial and irreparable harm as alleged herein.

**B.    The Telecom Defendants Failed to Prevent the Ignition and Spread of Wildfire**

140.    In addition to the general allegations set forth above, Plaintiffs make the following allegations specifically against the Telecom Defendants and in support of both the Causes of Action brought against the Telecom Defendants and the damages set forth in the Prayer for Relief contained herein.

141.    The Telecom Defendants provide telecommunications services to citizens of Hawaiʻi, including on the island of Maui. Accordingly, they are regulated by the Hawaiʻi Public Utilities Commission and subject to the regulations, orders, and general rules of the Commission, including HPUC General Order No. 6 and the Hawaiʻi Administrative Rules, as well as all laws of the State of Hawaiʻi, including section 10.10.3.1 of the Hawaiʻi State Fire Code.

142.    To provide telecommunications services, the Telecom Defendants design, construct, inspect, and maintain certain physical infrastructure, including poles, cables, wiring, equipment, connectors, hardware and other component parts and products that are or combine to form telecom facilities.

143.    In some instances, the Telecom Defendants own or control their own poles or physical fixtures and facilities to support their telecom infrastructure. In others, the Telecom Defendants enter into agreements with third parties, such as the Utility Defendants and Landowner Defendants, which permit them to use third party property, including utility poles or other structures, to support their telecom infrastructure. Accordingly, the Telecom Defendants own or otherwise have interests in property, easements, rights of way, and fixtures which are used or intended to be used in their businesses.

144.    While some of the Telecom Defendants' facilities are new, many of them are a patchwork of facilities constructed at different times, in part because they are subject to harsh island conditions, wear and require maintenance at different rates. Regardless of whether their telecom facilities are independently owned or part of a joint agreement with a third party, the Telecom Defendants had a duty to ensure that those facilities did not pose a risk of harm to third parties, including by causing or contributing to the ignition and spread of a wildfire.

145.    To manage their facilities, the Telecom Defendants engaged in the hiring, training, and retention of employees, agents, and contractors responsible for the design, construction, inspection, and maintenance of those facilities, including the placement of equipment and management of vegetation at or near that equipment.

146.    The Telecom Defendants were responsible for developing policies, practices, and procedures for ensuring that any employee, agent, or contractor performing activities which impacted

**31**

their facilities was properly trained, prepared, and overseen to ensure that their conduct did not create a risk of harm to third parties.

147.    In order to ensure that their facilities did not pose a risk of harm, the Telecom Defendants should have taken steps to ensure that those facilities were designed, constructed, inspected, and maintained in accordance with, and where necessary in excess of, any industry standards for telecom facilities.

148.    The Telecom Defendants were, at all times relevant, required to comply with the standards for overhead communications facilities as set forth in HPUC General Order No. 6 and H.A.R. § 6-73-13 and H.A.R. § 6-80-87.

149.    In addition to, and coextensive with, their general duties under the law, the Telecom Defendants were, at all times relevant, required to: (i) design, construct, install, operate, and maintain their plants, facilities in a manner consistent with prudent and generally accepted telecommunications industry practices and standards; (ii) adopt and adhere to a maintenance program to ensure safe, adequate, and reliable service at all times; (iii) adopt and maintain service reliability procedures and standards; and (iv) adopt and maintain a suitable safety program pursuant to H.A.R § 6-80-87, including subdivisions (4), (7), (9), and (12).

150.    Further, and pursuant to H.A.R. § 6-73-13, the Telecom Defendants were required to comply with the standards set forth in the National Electric Safety Code.

151.    Yet, the Telecom Defendants failed to exercise reasonable care in the design, construction, inspection, and maintenance of their telecom facilities which caused or contributed to the ignition of the Maui Fires. Examples of the Telecom Defendants' failures include, but are not limited to: (i) improperly loading or overloading wooden poles or other fixtures with their equipment, cabling, wiring, and other components; (ii) placing facilities in locations or in a manner that presented a foreseeable risk of energization and fire ignition as a result of contact with any third-party equipment or property; (iii) failing to properly inspect their own or nearby facilities which could foreseeable lead to an ignition; (iv) failing to inspect or maintain vegetation at or near their telecommunications facilities; (v) failing to ensure that the structures to which their equipment was attached was properly inspected and maintained in a manner that prevented against or mitigated the risk of an ignition.

152.     Plaintiffs are further informed, and thereon allege, that the Telecom Defendants failed to properly design, construct, inspect, and maintain their facilities in a manner that complied with HPUC General Order No. 6, H.A.R. § 6-73-13, and H.A.R § 6-80-87. These failures include not developing, implementing, or allocating the resources necessary to harden their property or equipment; maintaining equipment in a manner that did not adversely impact other infrastructure – including electrical facilities – over time and under certain weather conditions such as high winds; and not inspecting, identifying, or repairing equipment which did or reasonably could pose a risk of causing or contributing to the ignition or spread of a wildfire.

153.     In addition, the Telecom Defendants failed to develop or abide by standard policies, practices, and procedures related to the attachment of cable and wiring on wooden utility poles. Instead, the Telecom Defendants routinely overloaded their wooden poles and the wooden poles of third parties with excess equipment, cabling, wiring, or other physical infrastructure which caused or contributed to the wear or failure of those wooden poles over time.

154.     The Telecom Defendants knew or should have known that the failure to properly append cabling and other equipment to wooden poles would increase the rate of wear or failure of those poles under normal circumstances. Similarly, the Telecom Defendants knew that improperly loading wooden poles with cabling and other equipment posed a common sense and particularized risk of harm when those poles and equipment were subjected to high winds.

155.     Despite being aware of the commonsense risks posed by improperly maintaining their telecom facilities, the Telecom Defendants failed to take reasonable steps to design, construct, inspect, and maintain those facilities so that they, whether in isolation or in combination with other facilities, equipment, or property, did not cause or contribute to the ignition and spread of a wildfire.

156.     Further, Plaintiffs are informed, and thereon allege, that the Telecom Defendants failed to ensure that the employees, agents, and contractors acting on their behalf with respect to the design, construction, inspection, and maintenance of their facilities were competent or adequately trained or managed. As a result, those individuals and entities acting on behalf of the Telecom Defendants were not properly qualified to work on the telecom facilities or were otherwise unaware of the risks posed by their actions.

157.    By failing to properly conduct or oversee the design, construction, inspection, and maintenance of their facilities, including all overhead cables, wiring, hardware, fixtures, wooden and steel poles, and all attendant component parts and products, including ground wires, electrical services, cell sites, fiber optic cables, coaxial cables, connecting hardware, and all other components, the Telecom Defendants caused or contributed to the ignition and spread of the Maui Fires.

158.    As a result of the Telecom Defendants' failures, Plaintiffs suffered substantial and irreparable harm as alleged herein.

**C.      The Landowner Defendants Failed to Prevent the Ignition and Spread of Wildfire**

159.    In addition to the general allegations set forth above, Plaintiffs make the following allegations specifically against the Landowner Defendants and in support of both the Causes of Action brought against the Landowner Defendants and the damages set forth in the Prayer for Relief contained herein.

160.    For years, the Landowner Defendants knew that drought conditions and other environmental factors increased the presence of dry vegetation and grasses on or near their properties. The presence of these grasses posed a risk of harm by presenting the opportunity for causing a sparking event or by serving as ready fuel for a wildfire ignition.

161.    Plaintiffs are informed, and thereon allege, that maintaining or permitting the presence of readily combustible grasses, ground cover, and vegetation presented an unreasonable danger. The content and volume of certain grasses, ground cover, and vegetation presented a substantial risk of harm in the event of an ignition.

162.    Accordingly, the Landowner Defendants were responsible for ensuring that their property and land did not pose a risk of igniting or facilitating the spread of a wildfire and, at all times relevant, had a duty to ensure that vegetation – including trees, grasses, and other ignitable ground cover – as well as their properties generally, were managed in a way that would mitigate against the risk of wildfire ignition and spread.

163.    In addition to, and coextensive with, their common law duties regarding the management of their property, the Landowner Defendants were, at all times relevant, required to

comply with H.R.S. § 132-8, which requires all property owners to keep their premises "reasonably safe from loss of life or injury to persons or property by fire."

164.    Plaintiffs are informed, and thereon allege, that the Landowner Defendants did not implement policies, practices, or procedures that could be expected to clear or manage vegetation on their property. As a result, vegetation accumulated on the Landowner Defendants' property and, at the time of the Maui Fires was in a readily ignitable state.

165.    When the Maui Fires began, the Landowner Defendants' property facilitated the spread of the fire, at least in part, because the vegetation on the property was improperly managed. This mismanagement of property increased the severity of the Maui Fires and contributed to the death and destruction that followed.

166.    Had the Landowner Defendants taken reasonable steps to manage vegetation on their property, the Maui Fires would not have ignited or spread at such a rate, intensity, or severity. Instead, the Maui Fires ignited and spread, ambushing the citizens of the island – including Plaintiffs.

167.    Similarly, the Landowner Defendants could have and should have taken steps to ensure that their properties would not otherwise cause or contribute to the ignition and spread of a wildfire. Such measures could have included clearing ground cover, developing fire breaks, removing impediments to fire extinguishment, surveying the property and identifying high risk areas, and communicating with external stakeholders including the Utility Defendants, the Telecom Defendants, the County, and the State to ensure that all potential hazards were identified and remediated.

168.    Further, the Landowner Defendants negligently used, diverted, or mismanaged ground and surface waters at or near their properties that increased the hazardous conditions of those properties and contributed to the ignition the Maui Fires.

169.    Plaintiffs are informed, and thereon allege, that the Landowner Defendants' failures with respect to the management of their properties violated H.R.S. § 132-8.

170.    As a result of the Landowner Defendants' failures, Plaintiffs suffered substantial and irreparable harm as alleged herein.

**D.      The Public Entity Defendants Failed to Prevent the Ignition and Spread of the Maui Fires**

**i.      The Public Entity Defendants Negligently Maintained their Property**

171.    In addition to the general allegations set forth above, Plaintiffs make the following allegations specifically against the Public Entity Defendants and in support of both the Causes of Action brought against the Public Entity Defendants and the damages set forth in the Prayer for Relief contained herein.

172.    For years, the Public Entity Defendants knew that drought conditions and other environmental factors increased the presence of dry vegetation, grasses, and ground cover on or near their properties in the area of origin and spread of the Maui Fires. Those dry grasses and vegetation posed a risk of harm because they created a foreseeable risk of igniting and facilitating the spread of a catastrophic wildfire if not properly inspected, managed, or maintained.

173.    Accordingly, the Public Entity Defendants were responsible for ensuring that their properties and lands, and other properties and lands over which they had a mandatory duty to inspect, did not pose a risk of igniting or facilitating the spread of a wildfire. Accordingly, the Public Entity Defendants had a duty to ensure that vegetation – including trees, grasses, and other ignitable ground cover – as well as their properties generally, were managed in a way that would mitigate against the risk of wildfire ignition and spread.

174.    Similarly, the Public Entity Defendants, including the County and the State, had a duty to ensure that any fixtures or property, including those attached to or located near the facilities of the Utility Defendants or the Telecom Defendants, were managed in a way that would mitigate against the risk of wildfire ignition and spread.

175.    Plaintiffs are informed, and thereon allege, that the Public Entity Defendants failed to maintain their property in a manner that could be expected to clear or manage vegetation on their property and, further, follow operational procedures in place for the management of their property and the properties of others. As a result, vegetation accumulated on the Public Entity Defendants' properties and, at the time of the Maui Fires, was in a readily ignitable state. Plaintiffs further allege that the Public Entity Defendants' property, including property attached to or located near the facilities

of the Utility Defendants or the Telecom Defendants, caused or contributed to the ignition and spread of the Maui Fires.

176.    When the Maui Fires began, the Public Entity Defendants' property facilitated the spread of the fire, at least in part, because the vegetation on the property was improperly managed. This mismanagement of property increased the severity of the Maui Fires and contributed to the death and destruction that followed.

177.    Had the Public Entity Defendants taken reasonable steps to manage their properties, including the management of vegetation on their properties, the Maui Fires would not have ignited or spread at such a rate, intensity, or severity. Instead, the Maui Fires ignited and spread, ambushing the citizens of the island – including Plaintiffs.

178.    Similarly, the Public Entity Defendants failed to follow operational and maintenance procedures to ensure that their properties would not otherwise cause or contribute to the ignition and spread of a wildfire. Such measures could have included inspecting property, clearing ground cover, developing fire breaks, removing impediments to fire extinguishment, surveying the property and identifying high risk areas, and communicating with external stakeholders including the Utility Defendants, the Telecom Defendants, and the Landowner Defendants to ensure that all potential hazards were identified and remediated.

**ii.    The County Violated its Statutory Duties to Identify Potential Fire Hazards**

179.    The County, by and through its Department of Fire and Public Safety, is responsible for identifying, recording, and directing the abatement of potential fire hazards through a system of documentation and code enforcement. At all times relevant, the County had a non-delegable duty to abide by all provisions of the Hawaiʻi Revised Statutes, including H.R.S. § 132-6, *et seq*, and the Maui County Fire Code.

180.    Plaintiffs are informed, and thereon allege, that the County was subject to section 132-6 of the Hawaiʻi Revised Statutes, which provides that: "[e]ach county fire chief, in person or by officers or members of the fire chief's fire department designated by the fire chief for that purpose, shall inspect all buildings, premises, and public thoroughfares, except the interiors of private dwellings and state-owned airport facilities, for the purpose of ascertaining and causing to be corrected any conditions

liable to cause fire or any violation of any law, ordinance, rule, or order relating to fire hazard or to the prevention of fires."

181.    Further, H.R.S. § 132-6(b) requires the inspections be conducted "[a]t least once every five years, or as often as deemed practicable or necessary by the county fire chief at all other buildings and premises to provide fire prevention and pre-fire planning within the jurisdiction of the county fire chief." Meanwhile, H.R.S. § 132-6(c) requires the County to create and retain a written report of each inspection.

182.    H.R.S. § 132-6(e) further provides that when the County determines that a "law, ordinance, rule or order relating to protection from fire loss has been violated or that a condition exists which creates an unreasonable risk of fire loss, the fire chief shall prepare and serve upon the owner, occupant or other person responsible for the building or premises a written order setting forth the nature of the alleged violation or condition, the law, ordinance, rule or order violated, and the protections, safeguards, or other means or methods required to render the building or premises safe as required by law, ordinance, or rule."

183.    Further, and at all times relevant, the County was bound by all provisions of the Maui County Fire Code. Pursuant to the Maui County Fire Code, the County was required to ensure that "[c]ut or uncut weeds, grass, vines, and other vegetation shall be removed when determined . . . to be a fire hazard" (§ 10.13.10.1); "[w]hen [the relevant authority determines] total removal of growth is impractical due to size or environmental factors, approved fuel breaks shall be established" (§ 10.13.10.2); "remove combustible vegetation and combustible materials or establish firebreaks upon a property that has been deemed a fire hazard when corrective action has not been provided within the time-frame stated in the notice of violation" (10.13.10.4); maintain "[d]esignated fuel breaks and prescribed actions to abate a fire hazard shall be maintained at all times" (10.13.10.5); and to "[c]ut or uncut weeds, grass, vines and other vegetation shall be removed and maintained throughout the calendar year when determined by the chief to be a fire hazard. When the chief determines that total removal of growth is impractical due to size or environmental factors, approved fuel breaks shall be established. Designated areas shall be cleared of combustible vegetation to establish the fuel breaks." 1103.2.4.

184.    Plaintiffs are informed, and thereon allege, that the County breached its duties under H.R.S. § 132-6 including by failing to perform inspections on a regular cadence either pursuant to the terms of the statute or as reasonably necessary to prevent the risk of ignition. Further, the County failed to document and issue notices concerning potential fire hazards that it did or reasonably should have identified.

185.    Plaintiffs are informed, and thereon allege, that the County's action and inaction concerning the inspection and identification of fire hazards on property at or near the areas of origin and spread of the Maui Fires violated the duties promulgated under HRS § 132-6 and, by incorporation, the Maui Fire Code.

186.    Plaintiffs are also informed, and thereon allege, that the County failed to comply with procedures set forth in its inspection programs in a way that would identify potential risks on properties it inspected, including but not limited to: (1) failing to make written reports of its inspections as required in HRS § 132-6(c); (2) failed to enforce the Maui County Fire Code as required in HRS § 132-6(a); and (3) failing to provide notice of unsafe and violative conditions to the landowners where dangerous conditions caused or contributed to the ignition and the spread of the Maui Fires as required by HRS § 132-6(e).

187.    The County's failures with regards to its inspection duties and enforcement of the fire code were substantially magnified by its separate conduct in failing to design, build, and operate an effective warning system that could have alerted residents and visitors of the oncoming fires. Such emergency management failures exacerbated the County's already inexcusable conduct and breach of its duty of care to the public as outlined above.

188.    As a direct and proximate result of the County's negligence, the Maui Fires ignited and spread.

**E.      The Public Entity Defendants' Negligently Designed Exit-Route Roadways**

189.    At all times relevant, the Public Entity Defendants owed Plaintiffs a duty to exercise reasonable care in the design, construction, inspection, and maintenance of public roadways at or near Lahaina. These duties included ensuring that roadways were in a condition that permitted the safe ingress and egress for motor vehicles in the event of a disaster-related evacuation.

**39**

190.    Plaintiffs are informed, and thereon allege, that the Public Entity Defendants had actual or constructive notice, at least as of Hurricane Lane in 2018, that the roadways at or near the areas of origin of the Maui Fires, and particularly the Lahaina Fire, were not designed in a manner or in a condition that permitted safe ingress and egress for motor vehicles in the event of a disaster-related evacuation.

191.    Despite this knowledge, the Public Entity Defendants failed to take reasonably action to ensure their roadways would not pose an increased risk of harm to individuals travelling in motor vehicles during an evacuation, and particularly a mass evacuation in the event of a disaster.

192.    Accordingly, Plaintiffs fleeing the Maui Fires in vehicles were subjected to roadway conditions that impeded, delayed, or altered their evacuation routes and exposed them to personal injuries and emotional distress and, in some instances, death.

193.    As a direct and proximate result of the Public Entity Defendants' negligent design of their roadways, Plaintiffs suffered the damages alleged herein.

**F.    The Defendants' Individual and Collective Failures Caused Plaintiffs' Harms**

194.    Each and every Defendant had the means, knowledge, and opportunity to prevent the ignition, spread, and fallout of the Maui Fires. Each and every Defendant failed.

195.    The Maui Fires irreparably impacted Plaintiffs' lives. Many endure without housing and without jobs. Others mourn the losses of their parents, partners, siblings, children, and friends. Communities across the Hawaiian Islands and the country mourn with them.

196.    Plaintiffs seek to hold each and every Defendant liable for their contributions to the Maui Fires and their impacts and, accordingly, seek a judgment holding every Defendant jointly and severally liable for the damages alleged in the maximum amount permitted by law.

## VI.    Causes of Action[51]

### First Cause of Action – Negligence of Utility Defendants

197.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

198.    At all times relevant, the Utility Defendants, and each of them, were engaged in the activity of furnishing electricity for public use to retail electric customers in the State of Hawaiʻi.

199.    In order to furnish electricity or power within the State of Hawaiʻi to members of the public, the Utility Defendants deliberately constructed, inspected, and maintained electrical facilities. The Utility Defendants' electrical facilities included overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, reclosers, fuses, or connecting hardware.

200.    At all times relevant, the Utility Defendants knew their electrical facilities, and all components thereof, carried an inherent risk of fire ignition. The risks of fire ignition are not unique to the Utility Defendants' electrical facilities and, indeed, are well known and publicly acknowledged throughout the utility industry.

201.    At all times relevant, the Utility Defendants knew that vegetation near electrical facilities, including hazard trees, facility protect trees, and other vegetation, including vegetation outside of the right of way of an electrical facility, could damage facilities and cause an ignition during weather events such as a "red flag" warning event.

202.    At all times relevant, the Utility Defendants also knew or reasonably should have been aware of hazards associated with the operation of its electrical facilities under high-risk conditions, including high wind and drought conditions.

203.    Despite knowing and publicly acknowledging these risks, the Utility Defendants failed to implement a vegetation management program that included the removal of trees outside the right of way of electrical facilities.

204.    Indeed, the Utility Defendants did not have a comprehensive policy, practice, or procedure to inspect, evaluate, identify, or remediate certain vegetation that posed a risk of making contact with electrical facilities and, in turn, causing an ignition.

---

[51] Causes of Action Nos. 7, 8, 9, 10, 11, 15, and 16 are brought against each Defendant.

205.     Similarly, the Utility Defendants' vegetation management practices did not account for the inspection, evaluation, identification, and remediation of invasive species with weak root systems or which were prone to failure during high winds. Similarly, the Utility Defendants' vegetation management practices did not account for vegetation that could foreseeably be fuel for an ignition or cause an ignition or sparking event.

206.     At all times relevant, the Utility Defendants, and each of them, owed Plaintiffs a duty to exercise reasonable care in the design, construction, inspection, maintenance, and operation of their electrical facilities, including all overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, reclosers, fuses, or connecting hardware.

207.     The Maui Fires and the harms alleged herein were the direct and proximate result of the Utility Defendants' negligent, reckless, or unlawful conduct, including conduct which, in isolation or in combination with other factors, constituted a breach of their duties to Plaintiffs.

208.     At all times relevant, the Utility Defendants had actual knowledge of or a reasonable basis on which to anticipate the danger associated with its failure to reduce, restrict, or eliminate the flow of electricity through their facilities.

209.     The Utility Defendants, and each of them, breached their duties to Plaintiffs, including, among other actions and inactions, by:

a.   failing to comply with the applicable statutory, regulatory, and/or professional standards of care, including the laws of the State of Hawaiʻi and the rules, regulations, and orders of the Hawaiʻi Public Utilities Commission;

b.   failing to evaluate, design, implement, and execute policies, practices, and procedures reasonably calculated to mitigate against the risks their electrical facilities igniting a fire, including the development and use of a program to proactively de-energize those facilities when warranted by environmental conditions, such as "red flag" warnings;

c.   failing to de-energize power lines during fire prone conditions, including during forecasted and publicly broadcasted "red flag" warnings, high winds, dry spells or droughts, or any other environmental conditions reasonably foreseeable to contribute to the ignition of a fire;

d.  failing to evaluate, design, implement, and execute methods of isolating, closing, or otherwise limiting or restricting the flow of electricity through electrical facilities;

e.  failing to de-energize power lines after obtaining actual or constructive knowledge that a fire had actually ignited and/or when it was not possible under the circumstances to eliminate the possibility that a fire had ignited;

f.  failing to evaluate, design, implement, and execute policies, practices, and procedures reasonably calculated to provide warnings to members of the public in the event of a fire ignition;

g.  failing to timely and properly design, construct, inspect, maintain, manage, operate, and/or monitor their electrical facilities, including all overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, reclosers, fuses, or connecting hardware;

h.  failing to evaluate, design, implement, and execute policies, practices, and procedures reasonably calculated to mitigate against the risk of vegetation causing their electrical facilities to ignite a fire;

i.  failing to properly implement, execute, or oversee vegetation management practices, including those concerning the cutting, trimming, pruning, clearing, removal, or other management of vegetation for the purpose of avoiding foreseeable contact with their electrical facilities;

j.  failing to make their electrical facilities, including all overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, reclosers, fuses, or connecting hardware safe under all the exigencies created by surrounding circumstances and conditions;

k.  failing to install covered conductors or other insulated wires on their electrical facilities, including all overhead distribution circuits for the purpose of reducing the likelihood of faults occurring as a result of foreseeable contact between conductor with foreign objects, and with other electrical equipment;

l.  failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections of their electrical facilities, including all overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, reclosers, fuses, or connecting hardware;

m.  failing to design, construct, monitor, and/or maintain their electrical facilities, including all overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, reclosers, fuses, or connecting hardware in a manner reasonably calculated to prevent ignition of a fire;

n.  failing to install the equipment necessary and/or to inspect and repair the equipment installed, to prevent their electrical facilities, including all overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, reclosers, fuses, or connecting hardware from improperly sagging, operating, and/or contacting other metal wires placed on its poles and igniting fires;

o.  failing to keep all electrical facilities, regardless of age, voltage, style, material, or construction, in a safe condition at all times in order to prevent a fire ignition;

p.  failing to properly train or supervise their agents, contractors, or employees responsible for maintenance and inspection of their electrical facilities and/or vegetation near those facilities;

q.  failing to assess, budget, allocate, reserve, or distribute funds reasonably necessary to ensure their electrical facilities would not, because of a deficiency in the manner in which they were designed, constructed, inspected, maintained, managed, or overseen, pose a risk of fire ignition;

r.  failing to ensure that the corporate governance and compensation structure of all entities properly incentivized the directors, officers, employees, and managing agents of the enterprise to consider and prioritize wildfire risk.

210.  Further, and at all times relevant, the Utility Defendants, and each of them, were subject to the standards for electric services in the State of Hawaiʻi and all rules, regulations, standards, and

44

orders set forth by the Hawai'i Public Utilities Commission, including HPUC General Orders Nos. 6 and 7 and H.A.R. § 6-73-13.

211.    H.A.R. § 6-73-13 and General Orders Nos. 6 and 7 set forth standards for electrical utility service in the State of Hawai'i and required the Utility Defendants to exercise reasonable care to reduce hazards to which its employees, customers, and general public may be subjected.

212.    Further, at all times relevant, H.A.R. § 6-73-13 and General Orders Nos. 6 and 7 required the Utility Defendants to comply with acceptable standards for the design, construction, inspection, maintenance, and operation of overhead electrical distribution lines, including overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, and connecting hardware with the standards set forth in General Order No. 6.

213.    Plaintiffs are informed and thereon allege that the Utility Defendants' electrical facilities, including overhead electrical distribution circuits and all of their component parts and products, such as conductors, jumpers, and connecting hardware did not satisfy the requirements of H.A.R. § 6-73-13, General Order No. 6, or General Order No. 7.

214.    Plaintiffs are among the class of persons whom H.A.R. § 6-73-13 and General Orders Nos. 6 and 7 are intended to protect, and the class of harms they suffered were among the harms that H.A.R. § 6-73-13 and General Orders Nos. 6 and 7 are intended to protect against.

215.    As a direct and proximate result of the Utility Defendants' violations of H.A.R. § 6-73-13 and General Orders Nos. 6 and 7, the Maui Fires ignited and spread, causing the damages herein alleged.

216.    Further, and at all times relevant, the Utility Defendants, and each of them, were subject to section 10.10.3.1 of the Hawai'i State Fire Code, which provides that "[o]utdoor fires shall not be built, ignited, or maintained upon hazardous fire areas without approval" as required.

217.    Plaintiffs are informed, and thereon allege, that the Utility Defendants' conduct, whether in isolation or in combination with the conduct of any other Defendant or any third-party, ignited an outdoor fire in a hazardous fire area without required approval in violation of section 10.10.3.1 of the Hawai'i State Fire Code.

218.     Plaintiffs are among the class of persons section 10.10.3.1 of the Hawaiʻi State Fire Code seeks to protect, and the harm suffered by Plaintiffs are among the class of harms against which section 10.10.3.1 of the Hawaiʻi State Fire Code seeks to prevent.

219.     As a direct and proximate result of the Utility Defendants' negligence, the Maui Fires ignited and spread, causing the damages herein alleged.

220.     To the extent that damages are an inadequate remedy for the ongoing and reasonably foreseeable future harm caused by the Defendants' conduct, Plaintiffs seek equitable relief.

221.     For these reasons, Plaintiffs seek a permanent injunction ordering the Utility Defendants to stop their continued violations of HPUC General Orders Nos. 6 and 7, H.A.R. § 6-73-13, and any standards incorporated therein;

222.     For these reasons, Plaintiffs also seek an injunction ordering all the Utility Defendants to remediate the ongoing public nuisance created by the Maui Fires, including those conditions prohibited by Chapter 20.04.010 of the Maui County Code.

223.     Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawaiʻi against the Utility Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**Second Cause of Action – Negligence of the Telecom Defendants**

224.     Plaintiffs incorporate each and every allegation above as though fully set forth herein.

225.     At all times relevant, the Telecom Defendants, and each of them, were engaged in the activity of furnishing communications services to customers in the State of Hawaiʻi.

226.     In order to furnish electricity or power within the State of Hawaiʻi to members of the public, the Telecom Defendants deliberately designed, constructed, inspected, and maintained telecom facilities. The Telecom Defendants' facilities included overhead cables, wiring, hardware, fixtures, wooden and steel poles, and all attendant component parts and products, including ground wires, electrical services, cell sites, fiber optic cables, coaxial cables, connecting hardware, and all other components.

227.     At all times relevant, the Telecom Defendants knew their facilities, and all components thereof, and particularly those connected to or near an electrical facility owned or operated by the

Utility Defendants, carried an inherent risk of fire ignition. The risks of fire ignition are not unique to the Telecom Defendants' facilities and, indeed, are well known and publicly acknowledged throughout the telecommunications industry.

228.    At all times relevant, the Telecom Defendants knew that vegetation near their facilities, including hazard trees, facility protect trees, and other vegetation, including vegetation outside of the right of way of a telecom facility, could damage facilities and cause an ignition during weather events such as a "red flag" warning event.

229.    At all times relevant, the Telecom Defendants also knew or reasonably should have been aware of hazards associated with the placement and operation of their facilities under high-risk conditions, including high wind and drought conditions, including the risks that the placement and loading of their facilities could materially impact the integrity and safety of nearby electrical facilities.

230.    Despite knowing these risks, the Telecom Defendants failed to implement a vegetation management program that included the removal of vegetation at or near the site of their facilities, but which could be readily identified and remedied.

231.    Indeed, the Telecom Defendants did not have a comprehensive policy, practice, or procedure to inspect, evaluate, identify, or remediate certain vegetation that posed a risk of contacting electrical facilities and, in turn, causing an ignition.

232.    Similarly, the Telecom Defendants' vegetation management practices did not account for the inspection, evaluation, identification, and remediation of invasive species with weak root systems or which were prone to failure during high winds. Similarly, the Telecom Defendants' vegetation management practices did not account for vegetation that could foreseeably be fuel for an ignition or cause an ignition or sparking event.

233.    At all times relevant, the Telecom Defendants, and each of them, owed Plaintiffs a duty to exercise reasonable care in the design, construction, inspection, maintenance, and operation of their telecom facilities, including all overhead cabling and wiring, all wooden poles or other stationary objects to which that cabling or wiring was attached, and all component parts and products of their telecom facilities, including ground wires, electrical services, cell sites, fiber optic cables, coaxial cables, connecting hardware, and all other components.

234.    The Maui Fires and the harms alleged herein were the direct and proximate result of the Telecom Defendants' negligent, reckless, or unlawful conduct, including conduct which, in isolation or in combination with other factors, constituted a breach of their duty to Plaintiffs.

235.    At all times relevant, the Telecom Defendants had actual knowledge of or a reasonable basis on which to anticipate the danger associated with their failure to reduce, restrict, or eliminate the flow of electricity through their facilities.

236.    The Telecom Defendants, and each of them, breached their duties to Plaintiffs, including, among other action and inaction, by:

   a.    failing to comply with the applicable statutory, regulatory, and/or professional standards of care, including the laws of the State of Hawaiʻi and the rules, regulations, and orders of the Hawaiʻi Public Utilities Commission;

   b.    failing to evaluate, design, implement, and execute policies, practices, and procedures reasonably calculated to mitigate against the risks of their telecom facilities igniting or contributing to the ignition of a fire;

   c.    failing to timely and properly design, construct, inspect, maintain, manage, operate, and/or monitor their telecom facilities, including all cabling and wiring, all wooden poles or other stationary objects to which that cabling or wiring was attached, and all component parts and products of their telecom facilities, including ground wires, electrical services, cell sites, fiber optic cables, coaxial cables, connecting hardware, and all other components;

   d.    failing to evaluate, design, implement, and execute policies, practices, and procedures reasonably calculated to mitigate against the risk of vegetation causing their telecom facilities to ignite or contribute to the ignition of a fire;

   e.    failing to properly implement, execute, or oversee vegetation management practices actually designed, including those concerning the cutting, trimming, pruning, clearing, removal, or other management of vegetation for the purpose of avoiding foreseeable contact with their telecom facilities;

    f.   failing to make their telecom facilities, including all cabling and wiring, all wooden poles or other stationary objects to which that cabling or wiring was attached, and all component parts and products of their telecom facilities, including ground wires, electrical services, cell sites, fiber optic cables, coaxial cables, connecting hardware, and all other components safe under all the exigencies created by surrounding circumstances and conditions, including high wind and drought conditions;

    g.   failing to conduct adequate, reasonably prompt, proper, effective, and/or frequent inspections of their telecom facilities, including all cabling and wiring, all wooden poles or other stationary objects to which that cabling or wiring was attached, and all other component parts and products of their telecom facilities, including ground wires, electrical services, cell sites, fiber optic cables, coaxial cables, connecting hardware, and all other components;

    h.   failing to design, construct, monitor, and/or maintain their telecom facilities, including all cabling and wiring, all wooden poles or other stationary objects to which that cabling or wiring was attached, and all other component parts and products of their telecom facilities, including ground wires, electrical services, cell sites, fiber optic cables, coaxial cables, connecting hardware, and all other components in a manner reasonably calculated to prevent ignition of a fire;

    i.   failing to install the equipment necessary and/or to inspect and repair the equipment installed, to prevent their telecom facilities, including all cabling and wiring, all wooden poles or other stationary objects to which that cabling or wiring was attached, and all other component parts and products of their telecom facilities, including ground wires, electrical services, cell sites, fiber optic cables, coaxial cables, connecting hardware, and all other components from improperly sagging, operating, and/or making contact with other potential ignition sources, including electrical facilities owned and operated by the Utility Defendants;

    j.   failing to keep all telecom facilities, regardless of age, voltage, style, material, or construction, in a safe condition at all times in order to prevent a fire ignition;

**49**

k.  failing to properly train or supervise their agents, contractors, or employees responsible for maintenance and inspection of their telecom facilities and/or vegetation near those facilities;

l.  failing to assess, budget, allocate, reserve, or distribute funds reasonably necessary to ensure their telecom facilities would not, because of a deficiency in the manner in which they were designed, constructed, inspected, maintained, managed, or overseen, pose a risk of fire ignition;

m.  failing to ensure that the corporate governance and compensation structure of all entities properly incentivized the directors, officers, employees, and managing agents of the enterprise to consider and prioritize wildfire risk.

237.    At all times relevant, the Telecom Defendants, and each of them, were subject to the standards for telecommunications services in the State of Hawai'i and all rules, regulations, standards, and orders set forth by the Hawai'i Public Utilities Commission, including HPUC General Order No. 6, H.A.R. § 6-73-13, H.A.R § 6-80-87, H.A.R. § 16-131-6, H.A.R. § 16-131-39.4 and any standards incorporated therein.

238.    These regulations required the Telecom Defendants to meet the standards for overhead telecommunications facilities and also to: (i) design, construct, install, operate, and maintain their plants, facilities in a manner consistent with prudent and generally accepted telecommunications industry practices and standards; (ii) adopt and adhere to a maintenance program to ensure safe, adequate, and reliable service at all times; (ii) adopt and maintain service reliability procedures and standards; (iii) adopt and maintain a suitable safety program.

239.    Plaintiffs are informed, and thereon allege, that the Telecom Defendants' actions and inactions with respect to their telecom facilities associated with the ignition and spread of the Maui Fires, whether in isolation or in combination with the conduct of any other Defendant, constituted violations of HPUC General Order No. 6, H.A.R. § 6-73-13, H.A.R § 6-80-87, H.A.R. § 16-131-6, H.A.R. § 16-131-39.4, and any standards incorporated therein.

240.    Plaintiffs are among the class of persons whom HPUC General Order No. 6, H.A.R. § 6-73-13, and H.A.R § 6-80-87 seek to protect, and the harms Plaintiffs suffered are among the class of

harms against which HPUC General Order No. 6, H.A.R. § 6-73-13, and H.A.R § 6-80-87 seek to protect.

241.    As a direct and proximate result of the Telecom Defendants' violations of HPUC General Order No. 6, H.A.R. § 6-73-13, H.A.R § 6-80-87, H.A.R. § 16-131-6, H.A.R. § 16-131-39.4 and any standards incorporated therein, among others, the Maui Fires ignited and spread, causing the damages herein alleged.

242.    Further, and at all times relevant, the Telecom Defendants, and each of them, were subject to section 10.10.3.1 of the Hawaiʻi State Fire Code, which provides that "[o]utdoor fires shall not be built, ignited, or maintained upon hazardous fire areas without approval" as required.

243.    Plaintiffs are informed, and thereon allege, that the Telecom Defendants' conduct, whether in isolation or in combination with the conduct of any other Defendant or any third-party, ignited an outdoor fire in a hazardous fire area without required approval in violation of section 10.10.3.1 of the Hawaiʻi State Fire Code.

244.    Plaintiffs are among the class of persons section 10.10.3.1 of the Hawaiʻi State Fire Code seeks to protect, and the harm suffered by Plaintiffs are among the class of harms against which section 10.10.3.1 of the Hawaiʻi State Fire Code seeks to prevent.

245.    As a direct and proximate result of the Telecom Defendants' negligence, the Maui Fires ignited and spread, causing the damages herein alleged.

246.    To the extent that damages are an inadequate remedy for the ongoing and reasonably foreseeable future harm caused by the Defendants' conduct, Plaintiffs seek equitable relief.

247.    For these reasons, Plaintiffs seek a permanent injunction ordering the Telecom Defendants to stop their continued violations of HPUC General Order No. 6, H.A.R. §§ 6-80-87, 6-73-13, 16-131-6, 16-131-39.4, and any standards incorporated therein.

248.    For these reasons, Plaintiffs also seek an injunction ordering the Telecom Defendants to remediate the ongoing public nuisance created by the Maui Fires, including those conditions prohibited by Chapter 20.04.010 of the Maui County Code.

249.     Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against the Telecom Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**Third Cause of Action – Negligence of the Landowner Defendants**

250.     Plaintiffs incorporate each and every allegation above as though fully set forth herein.

251.     At all times relevant, the Landowner Defendants held interest in easements, rights of way, leaseholds, or other interests in real property in the areas of origin and spread of the Maui Fires. Further, the Landowner Defendants permitted the use of their property rights or interests via consent or contract.

252.     At all times relevant, the Landowner Defendants were required to abide by all laws of the State of Hawai'i and the County of Maui.

253.     As holders of such property interests, the Landowner Defendants owed Plaintiffs a duty to exercise reasonable care in the ownership, use, management, and control of such property, including in the management of vegetation, grasses, and other ignitable material at or near such property and/or the appropriate distribution and management of water on their properties, including the diversion or extraction of surface and ground waters.

254.     In addition to, and coextensive with, their common law duties regarding the management of their property, the Landowner Defendants were, at all times relevant, required to comply with H.R.S. § 132-8, which requires all property owners to keep their premises "reasonably safe from loss of life or injury to persons or property by fire."

255.     In light of the peculiar risks posed by the Utility Defendants' electrical facilities and the Telcom Defendants' facilities, especially during drought conditions and high winds, the Landowner Defendants owed Plaintiffs a heightened duty of care in order to ensure that their properties did not contribute to the ignition or spread of a wildfire.

256.     The Landowner Defendants, and each of them, acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control such property – including all vegetation, grasses, brush, or flammable material – as well as any facilities, appurtenances, improvements, and components thereon, such that said property was in an unsafe

condition and created a foreseeable risk of fire ignition, and in failing to warn of or eliminate such conditions.

257.     Similarly, the Landowner Defendants failed to take preparatory steps which, in the event of a fire ignition, could be reasonably calculated to prevent or mitigate the spread of the fire, including but not limited to the construction of fire breaks or other barriers.

258.     Plaintiffs are further informed, and thereon allege, that the Landowner Defendants' conduct, whether in isolation or in combination with the conduct of any other Defendant or any third-party, constituted a violation of H.R.S. § 132-8.

259.     Plaintiffs are among the class of persons section H.R.S. § 132-8 seeks to protect, and the harm suffered by Plaintiffs are among the class of harms against which H.R.S. § 132- seeks to prevent.

260.     Further, and at all times relevant, the Landowner Defendants, and each of them, were subject to section 10.10.3.1 of the Hawai'i State Fire Code, which provides that "[o]utdoor fires shall not be built, ignited, or maintained upon hazardous fire areas without approval" as required.

261.     Plaintiffs are informed, and thereon allege, that the Landowner Defendants' conduct, whether in isolation or in combination with the conduct of any other Defendant or any third-party, ignited an outdoor fire in a hazardous fire area without required approval in violation of section 10.10.3.1 of the Hawai'i State Fire Code.

262.     Plaintiffs are among the class of persons section 10.10.3.1 of the Hawai'i State Fire Code seeks to protect, and the harm suffered by Plaintiffs are among the class of harms against which section 10.10.3.1 of the Hawai'i State Fire Code seeks to prevent.

263.     As a direct and proximate result of the Landowner Defendants' negligence, the Maui Fires ignited and spread, causing the damages herein alleged.

264.     Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against the Landowner Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**Fourth Cause of Action – Negligence of the County**

265.     Plaintiffs incorporate each and every allegation above as though fully set forth herein.

266.     At all times relevant, the County was subject to section 132-6 of the Hawai'i Revised Statutes, which provides that: "[e]ach county fire chief, in person or by officers or members of the fire chief's fire department designated by the fire chief for that purpose, shall inspect all buildings, premises, and public thoroughfares, except the interiors of private dwellings and state-owned airport facilities, for the purpose of ascertaining and causing to be corrected any conditions liable to cause fire or any violation of any law, ordinance, rule, or order relating to fire hazard or to the prevention of fires."

267.     H.R.S. § 132-6(b) requires the inspections be conducted "[a]t least once every five years, or as often as deemed practicable or necessary by the county fire chief at all other buildings and premises to provide fire prevention and pre-fire planning within the jurisdiction of the county fire chief." Meanwhile, H.R.S. § 132-6(c) requires the County to create and retain a written report of each inspection.

268.     H.R.S. § 132-6(e) further provides that when the County determines that a "law, ordinance, rule or order relating to protection from fire loss has been violated or that a condition exists which creates an unreasonable risk of fire loss, the fire chief shall prepare and serve upon the owner, occupant or other person responsible for the building or premises a written order setting forth the nature of the alleged violation or condition, the law, ordinance, rule or order violated, and the protections, safeguards, or other means or methods required to render the building or premises safe as required by law, ordinance, or rule."

269.     At all times relevant, the County had a duty to exercise reasonable care in the design, construction, inspection, and maintenance of its property, including property at or near the areas of origin of the Maui Fires and nearby roadways and exit routes to ensure safe ingress and egress in the event of a disaster-related evacuation.

270.     The County breached its duties to the public and Plaintiffs including, among other actions and inactions, including but not limited to by:

a. failing to follow operational policies, practices, or procedures reasonably calculated and required to communicate the potential harm presented by a wildfire ignition to members of the public;

b. failing to inspect premises within its jurisdiction on a cadence or in a manner required by H.R.S. § 132-6 or any other provision of law;

c. failing to generate or retain records of potential fire hazards, including those required to be generated according to mandatory inspections;

d. failing to generate and issues notices of violation to landowners pursuant to H.R.S. § 132-6;

e. failing to exercise, as required by law, its authority under the Maui County Fire Code to remove hazardous vegetation, create fuel and firebreaks, and require other corrective action;

f. failing to exercise reasonable care in the ownership, management, and care of their property, easements, fixtures, and appurtenances such that they created an unreasonable risk of harm to Plaintiffs, including through their failure to implement policies, practices, or procedures concerning vegetation management to mitigate against or prevent the spread of fire on or near their property;

g. failing to design, construct, inspect, and maintain roadways that would foreseeable be used as means of ingress or egress in the event of a disaster-related evacuation in a manner that would not pose a risk of harm to individuals evacuating;

271.    Plaintiffs are informed, and thereon allege, both alone and in conjunction with H.R.S. § 132-6, that the Maui County Fire Code section 1103.2.4 expressly or implicitly required the County to: (1) identify weeds, grasses, vines, or other vegetation which may pose a fire hazard; (2) determine whether vegetation on property can or cannot be removed completely; (3) determine whether and to what extent a fuel break must be established on a property; and (4) identify and designate areas that must be cleared of vegetation in order to establish a fuel break.

272.    Plaintiffs are informed, and thereon allege, that the County breached its express or implied duties under H.R.S. § 132-6 and the Maui County Fire Code by failing to identify vegetation

which posed a hazard on its property or the property of others and by further failing to enforce firebreaks or other remedial measures, as required by statute or the County's own operating procedures, to make such property safe from fire hazard. The County's breach of its general duty to the public and Plaintiffs is supported by its breach of its statutory obligations which exist in part to protect the public from harm.

273.     Plaintiffs are among the class of persons H.R.S. § 132-6 and the Maui County Fire Code seeks to protect, and the harm suffered by Plaintiffs are among the class of harms against which H.R.S. § 132-6 and the Maui County Fire Code seeks to prevent.

274.     As a direct and proximate result of the County's conduct, the Maui Fires ignited and spread, causing the damages suffered by Plaintiffs.

275.     Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against the County as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

### Fifth Cause of Action – Negligence of the State

276.     Plaintiffs incorporate each and every allegation above as though fully set forth herein.

277.     At all times relevant, the State had a duty to exercise reasonable care in the design, construction, inspection, and maintenance of its property, including property at or near the areas of origin of the Maui Fires and nearby roadways and exit routes to ensure safe ingress and egress in the event of a disaster-related evacuation.

278.     The State breached its duties to the public and Plaintiffs including, among other actions and inactions, by:

a.   failing to exercise reasonable care in the ownership, management, and care of their property, easements, fixtures, and appurtenances such that they created an unreasonable risk of harm to Plaintiffs, including through their failure to implement policies, practices, or procedures concerning vegetation management to mitigate against or prevent the spread of fire on or near their property;

b.   failing to property inspect, document, and report potential fire hazards on or near the properties of others, including properties at or near the area of origin of the Maui Fires.

c.  failing to design, construct, inspect, and maintain roadways that would foreseeable be used as means of ingress or egress in the event of a disaster-related evacuation in a manner that would not pose a risk of harm to individuals evacuating;

279.   As a direct and proximate result of the State's conduct, the Maui Fires ignited and spread, causing the damages suffered by Plaintiffs.

280.   Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawaiʻi against the State as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

## Sixth Cause of Action – Abnormally Dangerous Activity

281.   Plaintiffs incorporate each and every allegation above as though fully set forth herein.

282.   At all times relevant the Landowner Defendants and Public Entity Defendants, and each of them, permitted the growth and accumulation of readily ignitable vegetation, grasses, brush, or ground cover at or near the areas of origin of the Maui Fires, including in close proximity to the facilities of the Utility Defendants and the Telecom Defendants.

283.   The vegetation fuels, which existed in bulk as a result of the Landowner Defendants' and the Public Entity Defendants' patterns and practices, created a potentially explosive fuel source for a wildfire ignition when left in close proximity to potential ignition sources, including the facilities of the Utility Defendants and the Telecom Defendants.

284.   By maintaining substantial quantities of readily ignitable fuel at or near the areas of origin of the Maui Fires, the Landowner Defendants and Public Entity Defendants were engaged in an abnormally dangerous activity that created a substantial risk of harm to the public even if performed with reasonable care.

285.   As a direct and proximate result of the Landowner Defendants' and Public Entity Defendants' respective abnormally dangerous activities of maintaining substantial quantities of combustible fuels near the facilities of the Utility Defendants and the Telecom Defendants, the Maui Fires ignited and spread and caused Plaintiffs the damages suffered by Plaintiffs.

286.   The Landowner Defendants and the Public Entity Defendants are strictly liable for the harms caused by their abnormally dangerous activities. The abnormally dangerous activity alleged

created a high degree of risk of harm to persons and property by increasing the risk of a wildfire ignition and spread; there was, at all times relevant, a substantial likelihood that the abnormally dangerous activities of the Landowner Defendants and the Public Entity Defendants would be great; the Landowner Defendants and the Public Entity Defendants could not have made their abnormally dangerous activities safe through the exercise of reasonable care; Landowner Defendants and the Public Entity Defendants carried out an activity that is not a matter of common usage; the existence of drought and other environmental conditions, including high winds, made the activities of the Landowner Defendants and the Public Entity Defendants inappropriate to the place where it was carried out; and the value, if any, placed on the abnormally dangerous activity was substantially outweighed by its dangerous attributes.

287.    As a direct and proximate result of the alleged abnormally dangerous activities of the Landowner Defendants and the Public Entity Defendants, the Maui Fires ignited and spread, causing the damages suffered by Plaintiffs.

288.    The Landowner Defendants and the Public Entity Defendants are strictly liable for all harm resulting from their abnormally dangerous activities.

289.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawaiʻi against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

### Seventh Cause of Action - Negligent Infliction of Emotional Distress

290.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

291.    Defendants, and each of them, were negligent as alleged above and, as a direct and proximate result of their negligence, the Maui Fires ignited and spread, causing the damages suffered by Plaintiffs.

292.    As a direct and proximate result of Defendants' negligence, whether in isolation or in combination with the conduct of any other Defendant, Plaintiffs were exposed to risks, hazards, and conditions that were unreasonably dangerous and which would reasonably be expected to inflict serious emotional harm upon Plaintiffs.

293.    As a further direct and proximate result of Defendants' respective and collective negligence, Plaintiffs suffered serious emotional distress.

294.    Plaintiffs are entitled to recover for their serious emotional distress without respect to whether they may prove a predicate harm under the laws of the State of Hawai'i.

295.    Regardless, Plaintiffs suffered physical impact or injury to their bodies, their property, or suffered a mental illness or injury or were placed in a physical peril or zone of danger, including the danger of a life-endangering threat, as a result of the Defendants' alleged conduct.

296.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**<u>Eighth Cause of Action – Premises Liability</u>**

297.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

298.    At all times relevant, the Defendants, and each of them, owned or held interests in easements, rights of way, or interests in real property in the area of origin of the Maui Fires.

299.    Further, Defendants, including the Utility Defendants and Telecom Defendants, owned and operated facilities, appurtenances, improvements, and all components upon such easements, rights of way, or interests for the purpose of furnishing services to the public.

300.    As holders of such property interests, Defendants owed Plaintiffs a duty to exercise reasonable care in the ownership, care, maintenance, management, and use of the property itself and all fixtures and appurtenances upon the property. Further, Defendants had a duty to ensure that Plaintiffs were not exposed to risks of an offsite injury as a result of Defendants' maintenance of their property, regardless of their legal relationship or relationships to the Plaintiffs.

301.    The gravity of foreseeable harm posed by Defendants' ownership, control, and operation of their property, including the harm posed by the ignition and spread of wildfire, outweighs any conceivable burden imposed by engaging in safer, alternative conduct.

302.    To the extent the condition or conditions on Defendants' property which caused or contributed to Plaintiffs' harms alleged herein were unnatural, Defendants are responsible for those harms because Defendants: created or contributed to the unnatural condition or conditions which

caused or contributed to Plaintiffs' injuries; consented or acquiesced to a third-party's creation of the condition or conditions; or failed to exercise reasonable care to make the condition safe after it was discovered, regardless of whether it was created with Defendants' consent or acquiescence.

303.    To the extent the condition or conditions on Defendants' property which caused or contributed to Plaintiffs' harms alleged herein were natural, Defendants had a duty to ensure that those conditions did not pose a risk of injury to Plaintiffs, including the ignition and spread of wildfire.

304.    Defendants, and each of them, knew and had superior knowledge to Plaintiffs concerning the dangers of Defendants' property interests, which placed Defendants in a better position to anticipate and take action to prevent the foreseeable injuries caused by their property, including the ignition and spread of wildfire.

305.    The Defendants, and each of them, acted wantonly, unlawfully, carelessly, recklessly, and/or negligently in failing to properly inspect, manage, maintain, and/or control such property and the facilities, appurtenances, improvements, and components thereon, such that said property was in an unsafe condition and created a foreseeable risk of fire ignition, that the condition of the property caused or contributed to the spread of wildfire, and that the property was not preemptively cared for in a manner so as to mitigate the risk of a fire igniting and spreading over the property.

306.    To the extent that the danger associated with the condition of Defendants' property was open or obvious, Defendants are not absolved from their duty to prevent the harms herein alleged or their liability for their failure to prevent such harms.

307.    As a direct and proximate result of Defendants' conduct, the Maui Fires ignited and spread, causing the damages suffered by Plaintiffs.

308.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

309.    To the extent that damages are an inadequate remedy for the ongoing and reasonably foreseeable future harm caused by the Defendants' conduct, Plaintiffs seek equitable relief.

310.    Accordingly, Plaintiffs seek also seek a permanent injunction directing Defendants, and each of them, to abate the existing and continuing dangerous conditions presented by their respective properties as described above.

### Ninth Cause of Action – Public Nuisance

311.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

312.    At all times relevant, Plaintiffs held an interest in or occupied property at or near the site of the Maui Fires and had a right to occupy, enjoy, and/or use their property without interference by the Defendants or the consequences of the Defendants' conduct.

313.    At all times relevant, Defendants, and each of them, owed Plaintiffs a duty of care commensurate with their respective statuses, operations, interests, and as alleged above, to ensure that their respective actions or inactions, whether in isolation or in combination with the conduct of any other Defendants or third-party, did not cause or contribute to a threat of harm or injury to the public at large or Plaintiffs.

314.    At all times relevant, Defendants, and each of them were required to comply with Chapter 20.04.010 of the Maui County Code, which provides that it is unlawful and a public nuisance for any person, firm, or corporation in the County of Maui to cause, permit or allow to escape into the open air, smoke, soot, poisonous gases, dirt, dust or debris of any kind from any smokestack, chimney, flue or incinerator, or any opening of any building, or from any smoldering or open fires under his or its charge or control in such a manner or in such a place as to cause annoyance, detriment, or injury to the health of persons or damage to property.

315.    As a direct and proximate result of Defendants' conduct, the Maui Fires ignited and spread, causing the damages suffered by Plaintiffs. The Maui Fire has caused widespread devastation across the island of Maui. Thousands of structures, including residences and businesses, have been reduced to rubble. Thousands of acres have been turned to ash. Culturally significant and sacred spaces and artifacts have been extinguished. In the process, the Maui Fires created conditions harmful to the health of the public, such as smoke, ash, soot, and other forms of environmental and air, soil, and water pollution which interfered with Plaintiffs' comfortable occupancy, use, and/or enjoyment their

property. Plaintiffs did not consent nor could they have avoided the Defendants' wrongful conduct or the consequences thereof.

316.    The hazardous condition that the Defendants created and/or permitted to exist affected a substantial number of people within the general public, including Plaintiffs and constituted a public nuisance under the common law and the laws of the State of Hawaiʻi and the County of Maui.

317.    The damaging effects of Defendants' conduct and the resulting wildfires are ongoing and affect the public at large. Because of the fire's location, temperature, and duration, extensive areas of hydrophobic soil developed within the fire's perimeter. This caused significant post fire runoff hazards to occur, including hillside erosion, debris flow hazards, and sediment laden flow hazards. As a result, large quantities of ash and sediment will be deposited in perennial and ephemeral watercourses. Hazardous chemicals, debris, toxins, and debris will be found in the air, water, and soils of the affected areas and surrounding regions for years to come and constitute substantial environmental pollution.

318.    Plaintiffs are informed, and thereon allege, that the conduct of the Defendants, as alleged herein, constituted, and continue to constitute a violation of Chapter 20.04.010 of the Maui County Code.

319.    Plaintiffs are among the class of persons that Chapter 20.04.10 of the Maui County Code is intended to protect, and the harms suffered by Plaintiffs are among the class of harms against which Chapter 20.04.010 seeks to protect.

320.    As a direct and proximate result of Defendants' violations of Chapter 20.04.10, Plaintiffs suffered and continued to suffer, the damages alleged herein.

321.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered harm that is different from the type of harm suffered by the general public. Specifically, Plaintiffs lost the occupancy, possession, use, and/or enjoyment of their land, real, and/or personal property, including, but not limited to: a reasonable and rational fear that the area is still dangerous; a diminution in the fair market value of their property; an impairment of the salability of their property; soils that have become hydrophobic; exposure to an array of toxic substances on their land; and a lingering smell of smoke, and/or constant soot, ash, and/or dust in the air.

322.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered, and will continue to suffer, discomfort, anxiety, fear, worries, and stress attendant to the interference with their occupancy, possession, use, and/or enjoyment of their property, as alleged above.

323.    A reasonable, ordinary person would be annoyed or disturbed by the condition created by Defendants and the resulting fire.

324.    Defendants' conduct was, and is, unreasonable and the seriousness of the harm to the public, including Plaintiffs, outweighs the social utility, if any, of Defendants' conduct.

325.    Defendants' conduct, whether individually or collectively, as set forth above which caused or contributed to the devastation of the Maui Fires are not an isolated incident but are ongoing and/or a repeated course of conduct, and Defendants' prior conduct and/or failures have resulted in other fires and damage to the public.

326.    Defendants, through their individual and collective conduct, failed to take actions reasonably necessary to prevent against the ignition, spread, and fallout of a wildfire. Defendants' individual and/or collective failure to do so exposed every member of the public, residing and/or owning property in Maui County, to a foreseeable danger of personal injury, death, and/or a loss of or destruction real and personal property.

327.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered a condition which constitutes a public nuisance as defined in the common law and the laws of the State of Hawai'i. Plaintiff have standing to maintain an action for public nuisance because the nuisance is one that is especially injurious and/or offensive to the senses of the Plaintiffs, unreasonably interferes with the comfortable enjoyment of their properties, unlawfully obstructs the free and customary use of Plaintiffs' property, and caused individualized harm, injury, and damages alleged herein.

328.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

329.    To the extent that damages are an inadequate remedy for the ongoing and reasonably foreseeable future harm caused by the Defendants' conduct, Plaintiffs seek equitable relief.

330.    For these reasons, Plaintiffs seek a permanent injunction ordering the Utility Defendants to stop their continued violations of HPUC General Orders Nos. 6 and 7, H.A.R. § 6-73-13, and any standards incorporated therein;

331.    For these reasons, Plaintiffs seek a permanent injunction ordering the Telecom Defendants to stop their continued violations of HPUC General Order No. 6, H.A.R. §§ 6-80-87, 6-73-13, 16-131-6, 16-131-39.4, and any standards incorporated therein.

332.    For these reasons, Plaintiffs also seek an injunction ordering all Defendants to remediate the ongoing public nuisance created by the Maui Fires, including those conditions prohibited by Chapter 20.04.010 of the Maui County Code.

333.    Plaintiffs also seek an order directing Defendants, and each of them, to abate the existing and continuing public nuisance described above.

### Tenth Cause of Action – Private Nuisance

334.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

335.    As a direct and proximate result of Defendants' conduct, including through their proliferation of environmental pollutants, Plaintiffs suffered obstructions to, interference with, and invasion of, their right to freely use or enjoy their property and experienced unreasonable harm and substantial actual damages constituting a nuisance, under the common law and under the laws of the State of Hawai'i.

336.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered harm, injury, and damages in an amount according to proof at trial.

337.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

338.    To the extent that damages are an inadequate remedy for the ongoing and reasonably foreseeable future harm caused by the Defendants' conduct, Plaintiffs seek equitable relief.

339.    For these reasons, Plaintiffs seek a permanent injunction ordering the Utility Defendants to stop their continued violations of HPUC General Orders Nos. 6 and 7, H.A.R. § 6-73-13, and any standards incorporated therein;

340.    For these reasons, Plaintiffs seek a permanent injunction ordering the Telecom Defendants to stop their continued violations of HPUC General Order No. 6, H.A.R. §§ 6-80-87, 6-73-13, 16-131-6, 16-131-39.4, and any standards incorporated therein.

341.    For these reasons, Plaintiffs also seek an injunction ordering all Defendants to remediate the ongoing public nuisance created by the Maui Fires, including those conditions prohibited by Chapter 20.04.010 of the Maui County Code.

342.    Plaintiffs also seek an order directing Defendants, and each of them, to abate the existing and continuing public nuisance, including any and all environmental pollution described above.

**Eleventh Cause of Action – Trespass**

343.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

344.    At all times relevant, Plaintiffs held interests in property as owners, tenants, or lawful occupants. The property was located in Maui County in the State of Hawai'i and suffered damage from the Maui Fires.

345.    As a direct and proximate result of Defendants' conduct alleged herein, the Maui Fires ignited, spread, and harmed, injured, or otherwise trespassed upon the property in which Plaintiffs held their respective interests without consent from Plaintiffs, whether express or implied.

346.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered from a trespass, including through the proliferation of metals, toxins, chemicals, and other environmental pollutants, which caused, and continues to cause, damages in an amount to be proven at trial.

347.    As a direct and proximate result of Defendants' conduct, Plaintiffs suffered harm, injury, and damages in an amount according to proof at trial.

348.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**Twelfth Cause of Action – Inverse Condemnation – The County**

349.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

350.    Plaintiffs are, and at all times relevant were, private individuals who held lawful interests in real and personal property located in the State of Hawai'i.

351.    The County's conduct, as alleged herein, caused or contributed to the ignition and spread of the Maui Fires and resulted in the destruction of, damage to, reduction of value or marketability of, or interference with Plaintiffs' property interests.

352.    The constitution of the State of Hawai'i provides that private property shall not be taken or damaged for public use without just compensation.

353.    As a public entity, the County is vested with the power of eminent domain.

354.    To date, the County has not compensated Plaintiffs for the destruction of, damage to, reduction of value or marketability of, or interference with Plaintiffs' property interests.

355.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i, including the recovery of attorney's fees and costs, against the County as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**Thirteenth Cause of Action – Inverse Condemnation – The State**

356.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

357.    Plaintiffs are, and at all times relevant were, private individuals who held lawful interests in real and personal property located in the State of Hawai'i.

358.    The State's conduct, as alleged herein, caused or contributed to the ignition and spread of the Maui Fires and resulted in the destruction of, damage to, reduction of value or marketability of, or interference with Plaintiffs' property interests.

359.    The constitution of the State of Hawai'i provides that private property shall not be taken or damaged for public use without just compensation.

360.    As a public entity, the State is vested with the power of eminent domain.

361.    To date, the State has not compensated Plaintiffs destruction of, damage to, reduction of value or marketability of, or interference with Plaintiffs' property interests.

362.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawaiʻi, including the recovery of attorney's fees and costs, against the State as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**Fourteenth Cause of Action – Inverse Condemnation – The Utility Defendants**

363.    Plaintiffs incorporate each and every allegation above as though fully set forth herein.

364.    Plaintiffs are, and at all times relevant were, private individuals who held lawful interests in real and personal property located in the State of Hawaiʻi.

365.    The Utility Defendants' conduct, as alleged herein, caused or contributed to the ignition and spread of the Maui Fires and resulted in the destruction of, damage to, reduction of value or marketability of, or interference with Plaintiffs' property interests.

366.    The Utility Defendants operate a state-sanctioned monopoly that provides retail electrical service to approximately 95% of the population of the State of Hawaiʻi.

367.    In doing so, the Utility Defendants designed, constructed, inspected, maintained, and otherwise operated or oversaw the use of electrical facilities which caused or contributed to the ignition of the Maui Fires.

368.    The Utility Defendants' electrical facilities carried an inherent risk of fire ignition, and the Utility Defendants were well aware of that inherent risk prior to the Maui Fires, particularly under high winds conditions, "red flag" warnings, and drought conditions.

369.    The constitution of the State of Hawaiʻi provides that private property shall not be taken or damaged for public use without just compensation.

370.    As a public utility, the Utility Defendants are vested with the power of eminent domain, including the power to condemn property for public use through the provision of electricity.

371.    To date, the Utility Defendants have not compensated Plaintiffs for the destruction of, damage to, reduction of value or marketability of, or interference with Plaintiffs' property interests.

372.    Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawaiʻi, including the recovery of attorney's fees and costs, against the Utility Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**Fifteenth Cause of Action – Wrongful Death**

373.   Plaintiffs incorporate each and every allegation above as though fully set forth herein.

374.   As a direct and proximate result of Defendants' conduct alleged herein, the Decedent, or Decedents, suffered physical impacts and injury which caused or contributed to their deaths.

375.   As a direct and proximate result, Plaintiffs suffered the loss of society, companionship, comfort, consortium, and protection; marital care, attention, advice, or counsel; loss of care attention, advice, or counsel of a reciprocal beneficiary; loss of filial case or attention; or loss of parental care, training, guidance, or education as a result of the Decedents' death, and other harms permitted under H.R.S. § 663-3.

376.   Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawai'i against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

**Sixteenth Cause of Action – Survival Action**

377.   Plaintiffs incorporate each and every allegation above as though fully set forth herein.

378.   As a direct and proximate result of Defendants' conduct alleged herein, Decedents perished as a result of the effects of the in the Maui Fires.

379.   Prior to their deaths the Decedents suffered damages including costs for medical care, lost, damaged, or destroyed property, and pre-death impact or injury as well as attendant pain and suffering.

380.   Had Decedents survived, they would be entitled to bring an action against Defendants, and each of them, to recover all damages accrued as a result of Defendants' wrongful conduct.

381.   Pursuant to section 663-7 of the Hawai'i Revised Statutes, Plaintiffs brings this action against Defendants, and each of them, to recover all damages recoverable under the causes of action and claims not extinguished by any Decedent's death, including any and all claims for punitive or exemplary damages against and Defendant or group of Defendants as permitted under the laws of the State of Hawai'i.

382.     Accordingly, Plaintiffs seek all damages recoverable under the laws of the State of Hawaiʻi against Defendants as set forth in the Prayer for Relief contained herein, and in an amount according to proof at trial.

## VII.   Prayer for Relief

383.     Wherefore, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

(a)     Repair, depreciation, or replacement of damaged, destroyed or lost personal or real property;

(b)     Loss of the use or benefit of damaged, destroyed, or lost personal or real property;

(c)     Past and future medical expenses and incidental expenses in an amount according to proof;

(d)     General damages for fear, worry, annoyance, disturbance, inconvenience, mental anguish, emotional distress, loss of quiet enjoyment of property, personal injury, and pain and suffering, in an amount according to proof;

(e)     Damages for diminution in value of real and/or personal property

(f)     All costs of suit, including reasonable attorneys' fees and all other costs or fees, arising from the prosecution of this action as permitted under the laws of the State of Hawaiʻi;

(g)     Lost wages, earning capacity, or business profits, use, goodwill, or proceeds or any related displacement costs;

(h)     Prejudgment and post-judgment interest in the maximum amount permitted by law;

(i)     All costs and expenses incurred following relocation and all recoverable living expenses;

(j)     An order enjoining the Utility Defendants from violating HPUC General Orders Nos. 6 and 7; and H.A.R. § 6-73-13;

(k)     An order enjoining the Telecom Defendants from violating HPUC General Order No. 6 and H.A.R. §§ 6-80-87, 6-73-13, 16-131-6, 16-131-39.4, and any standards incorporated therein.

(l)    An order enjoining all Defendants to remedy the ongoing public nuisance created by the Maui Fires, including those conditions prohibited by Chapter 20.04.010 of the Maui County Code;

(m)    An order directing Defendants to abate all other private and public nuisances alleged herein;

(n)    An order directing Defendants to abate all environmental pollution, including the pollution of all waters and soils, as alleged herein;

(o)    For such other and further relief as the Court shall deem proper, all according to proof.

384.    Further, and in addition to the prayers set forth above, Plaintiffs pray for judgment against the Utility Defendants, and each of them, for punitive and exemplary damages as permitted by law.

385.    Further, and in addition to the prayers set forth above, Plaintiffs pray for judgment against the Landowner Defendants, and each of them, for punitive and exemplary damages as permitted by law.

386.    To the extent that Plaintiffs bring claims against for Wrongful Death or for a Survival Action on behalf of any Decedent, Plaintiffs pray for judgment against the Defendants, and each of them, as follows:

(a)    All compensable damages for wrongful death or survival damages as permitted under the laws of the State of Hawaiʻi;

(b)    Loss of consortium; loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and/or moral support from Decedents in an amount according to proof;

(c)    Funeral and/or burial expenses and/or related medical expenses and/or removal of Decedents' remains and other medical and/or emergency services related to their injury and death in an amount according to proof;

(d)    Economic losses, including but not limited to the loss of financial support, and/or the loss of household services in an amount according to proof of trial;

(e)  Losses and damages that the Decedents sustained before death, including all pre-death pain and suffering, emotional distress, and all other penalties or punitive or exemplary damages that the Decedents would have been entitled to recover had they lived;

(f)  All costs of suit, including reasonable attorneys' fees and all other costs or fees, arising from the prosecution of this action as permitted under the laws of the State of Hawaiʻi;

(g)  Prejudgment and post-judgment interest;

(h)  For such other and further relief as the Court shall deem proper, all according to proof.

Dated:  January 9, 2024                          By:

                                                 */s/ Jan K. Apo*
                                                 Jan K. Apo

                                                 */s/ Cynthia K. Wong*
                                                 Cynthia K. Wong

                                                 */s/ Jacob K. Lowenthal*
                                                 Jacob K. Lowenthal

                                                 */s/ Jesse M. Creed*
                                                 Jesse M. Creed

                                                 Liaison Counsel for Individual
                                                 Plaintiffs

## IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

## STATE OF HAWAI'I

*In re Maui Fire Cases*

**S.P. NO. 2CSP-23-0000057**

(Other Non-Motor Vehicle Tort - Maui Fire)

**Demand for Jury Trial**

| | |
|---|---|
| Circuit Judge: | Hon. Peter T Cahill |
| Division: | 2 |
| Trial Date: | None set. |

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  January 9, 2024

By:

*/s/ Jan K. Apo*
Jan K. Apo

*/s/ Cynthia K. Wong*
Cynthia K. Wong

*/s/ Jacob K. Lowenthal*
Jacob K. Lowenthal

*/s/ Jesse M. Creed*
Jesse M. Creed

Liaison Counsel for Individual
Plaintiffs